J-S78023-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOHN C. GUERRA | : | |
| | : | |
| Appellant | : | No. 3438 EDA 2017 |

Appeal from the Judgment of Sentence Entered May 4, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011956-2014

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED APRIL 08, 2019**

John C. Guerra appeals from the judgment of sentence entered following his convictions for numerous charges relating to his running a prostitution ring involving adult women and a minor. Guerra argues the evidence presented at trial was insufficient to support the convictions, that the trial court abused its discretion in allowing the Commonwealth to admit certain evidence, and that the court abused its discretion in sentencing Guerra. We affirm.

In December 2010, the Commonwealth filed charges against Guerra. He evaded arrest until his apprehension in August 2014. Guerra waived his right to a jury trial, and proceeded to a bench trial in June 2016.

The trial court thoroughly recounted the evidence presented at Guerra's bench trial. **See** Trial Court Opinion, filed 4/11/18, at 1-7. In short, the Commonwealth presented evidence that between 2008 and 2010, Guerra recruited young women to work for him as prostitutes, and assisted them in

_____
*   Former Justice specially assigned to the Superior Court.

posting advertisements online to solicit customers for sex. He also provided cell phones for the women to use to contact customers, and hotel rooms; received money the customers paid the women in exchange for sex; and provided the women with drugs and money. Guerra knew the women were addicted to drugs, and he supplied them with large amounts of crack cocaine and heroin. He made the women work for days at a time without sleep, used violence and sexual violence to keep them from leaving or withholding money, and prohibited them from seeking medical attention. Several other men assisted Guerra, including Elton Cromwell, Eddie Mendez, and Dwayne Thomas.

Three victims, M.S., T.W., and A.H., testified at trial. Of note, A.H. testified that she was a minor when she began working for Guerra, and that when Cromwell and Guerra discovered she was a minor, she stayed at Guerra's family home until Guerra made the decision that she would continue working. A.H. also testified that Cromwell went to her parents' house after charges were filed against him, and that this made her feel scared.

The Commonwealth also presented the testimony of Detective Derrick Stigerts, whom the Commonwealth offered as an expert in human trafficking, and Trooper Michael Peterson. Trooper Peterson testified that during the course of his investigation, he viewed the contents of a laptop found at the hotel where A.H. was found, which contained images and advertisements, some of which were introduced into evidence. Trooper Peterson said he interviewed five women who had worked for Guerra in two different hotel

rooms, including M.S., T.W., and A.H. Trooper Peterson stated that, through the investigation, he was able to identify the extent of Guerra's involvement in trafficking and prostitution, as well as the three other men in the organization. Trooper Peterson testified that based upon his investigation, he had concluded that Guerra "was in charge of an illegal, corrupt organization[.]" N.T., 6/29/16, at 97.

Guerra objected on the basis that the testimony was a legal conclusion. The court agreed that the ultimate issue was for the court, but stated it would allow Trooper Peterson to testify as to the basis for his conclusion. *Id.* at 97-98. Trooper Peterson testified that "through interviewing witnesses that testified and did not testify, all of their statements were clearly identifying each individual's roles in this organization. Some ladies put [Guerra] at the top of the pyramid." *Id.* at 98. Trooper Peterson stated he "concluded that [Guerra's] role was a leader of a corrupt organization, including prostitution." *Id.* Guerra again objected, and the court overruled the objection. *Id.* at 99. The Commonwealth confirmed that it was not offering Trooper Peterson as an expert witness. *Id.* The prosecutor then asked Trooper Peterson about his training and experience in the Organized Crime Unit, and his opinion as to why there was no financial trail implicating Guerra in the crimes. Trooper Peterson answered, "The head[s] of corrupt organizations always attempt to insulate themselves from their underlings . . . because they don't want to be implicated as being the ring leader." *Id.* at 101.

Guerra presented the testimony of M.T. and R.H., the mothers of children by Guerra and Cromwell, respectively, who had worked as prostitutes. Both women testified that A.H. had worked for Cromwell, and not Guerra; that Guerra had never threatened or assaulted any of the women working for him; and that Guerra did not force anyone to stay against their will. M.T. further testified that Guerra and Cromwell were friends, but did not work together or share employees, computers, phones, or money, and that M.S. would steal from Guerra to support her drug habit.

Guerra testified in his own defense. He admitted he had sex with A.H. on the first night of her arrival, but denied that A.H. had ever worked for him, and asserted that A.H. had worked for Cromwell, who had decided to take her back to work after discovering her minor status. Guerra denied working jointly with Cromwell or anyone else. He admitted that T.W. and M.S. had both worked for him, and that he would buy drugs in bulk to supply to his employees. But he denied that he had forced any of the women to work, or had threatened them. He denied that he was violent toward T.W. or had raped M.S., and stated that he had only slapped M.S. with an open fist on one occasion, because she owed him money.

The trial court convicted Guerra of trafficking of a minor, trafficking of persons, conspiracy to traffic persons, corrupt organizations, promoting prostitution, sexual exploitation of a child, unlawful contact with a minor, corruption of a minor, simple assault, criminal use of a communication facility,

and possession of a controlled substance with intent to distribute.[1] The court sentenced Guerra to an aggregate of 37 to 74 years' confinement, with sentences on seven charges running consecutively, and four charges running concurrently.

Guerra filed a post-sentence motion. The motion was denied by operation of law in September 2017, and Guerra filed a timely notice of appeal.

Guerra raises the following issues:

1. Did the Commonwealth present sufficient evidence to find [Guerra] guilty beyond a reasonable doubt?

2. Did the [c]ourt abuse its discretion in [s]entencing [Guerra] to an aggregate period of 37 to 74 years?

3. Did the [c]ourt [err] in permitting the investigating officer to testify as to his opinion that [Guerra] was the head of a corrupt organization thereby depriving [Guerra] of a fair trial?

4. Did the [c]ourt [err] in allowing testimony, elicited by the Commonwealth, involving an alleged threat by Elton Cromwell against a witness testifying against [Guerra] without establishing any connective link to [Guerra]?

Guerra's Br. at 4.

## I. Sufficiency of the Evidence

In his first issue, Guerra argues that the evidence was insufficient to support his convictions. Specifically, related to the charge of corrupt organizations, Guerra argues that there was insufficient evidence that he was involved in an enterprise. Guerra asserts that the trial testimony established

---

[1] 18 Pa.C.S.A. §§ 3002(b), 3002(a), 903, 911(b)(1), 5902(b)(1), 6320(a), 6318(a)(5), 6301(a)(1)(i), 2701(a), 7512(a) and P.S. § 780-113(a)(30), respectively.

that he operated separately from Cromwell, Mendez, and Thomas. Guerra also argues that there was no evidence establishing that income he earned from trafficking persons or distributing drugs was reinvested in that pursuit, such as financial records showing Guerra paid for hotel rooms, telephones, or online advertisements.

Guerra also argues that there was insufficient evidence he committed sexual exploitation of a child, unlawful contact with a minor, or trafficking of a minor. Guerra asserts A.H. testified she worked exclusively for Cromwell; there was no testimony or forensic computer evidence indicating that Guerra took photographs of A.H. or posted her advertisements; and there was no evidence that Guerra conspired with Cromwell to traffic A.H.

Regarding trafficking of the other two women, Guerra contends that M.S. testified she came to Philadelphia seeking to work as a prostitute. After voluntarily working for Guerra, she started working for Guerra's brother, Jason, after Jason threatened Guerra by showing him a firearm. Guerra contends that the testimony indicates he hit M.S. not to prevent her from leaving his employment, but in response to her stealing money to feed her drug habit.

Guerra argues that T.W. testified that she autonomously worked for Mendez, and then for Guerra, and then for Guerra's brother, Jason. Guerra asserts that T.W. testified that Guerra was only violent towards her during the times she was working for one of the other men. Guerra adds that defense

witnesses testified that he did not force any of the women to work for him, and that they could come and go as they pleased.

Guerra further argues that as he did not engage in trafficking, no conspiracy to commit trafficking existed.

Upon a challenge to the sufficiency of the evidence, "we must determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crime charged is established beyond a reasonable doubt." ***Commonwealth v. Green***, 2019 PA Super 39 (Feb. 12, 2019). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." ***Id.*** (citation omitted).

The trial court discussed the elements of the contested charges, and the evidence presented by the Commonwealth that met each element of those crimes. ***See*** Tr. Ct. Op. at 12-18 (corrupt organizations); 18-23 (conspiracy to traffic persons); 23-25 (sexual exploitation of a child); 30-32 (corruption of minors); 33-38, 44-45 (trafficking of a minor); 33-35, 38-45 (trafficking of persons); 45-50 (unlawful contact with a minor). After a review of the record, the applicable law, and the parties' briefs, we affirm on the basis of the well-reasoned opinion of the Honorable Sean F. Kennedy, which we adopt and incorporate herein. ***See id.***

## II. Sentencing

Guerra argues that the court abused its discretion in sentencing him to an aggregate period of 37 to 74 years' incarceration. As Guerra challenges discretionary aspects of his sentence, we must first determine whether we will allow the appeal. **Commonwealth v. Heaster**, 171 A.3d 268, 271 (Pa.Super. 2017), *appeal denied*, 181 A.3d 1078 (Pa. 2018). We will only do so if: (1) the appeal is timely; (2) the issue was preserved; (3) the brief includes a Pa.R.A.P. 2119(f) statement; and (4) the statement raises a "substantial question that the sentence appealed from is not appropriate under the Sentencing Code." **Id.** at 271-72 (quoting **Commonwealth v. Moury**, 992 A.2d 162, 170 (Pa.Super. 2010)). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Commonwealth v. White**, 193 A.3d 977, 982 (Pa.Super. 2018) (quoting **Commonwealth v. Griffin**, 65 A.3d 932, 935 (Pa.Super. 2013)).

In his Rule 2119(f) statement, Guerra argues that the court's sentence was contrary to fundamental sentencing norms because (1) the sentence was excessive, and the court stated at sentencing that it did not find any evidence supported a mitigated sentence, even though Guerra presented mitigating evidence, and (2) the trial court erred when it calculated Guerra's prior record score. **See** Guerra's Br. at 14-15.

Guerra's appeal is timely. Guerra preserved the claim that his sentence was excessive because the court failed to consider mitigating evidence, as he raised that issue in his post-sentence motion, in which he contended that his sentence was excessive and highlighted reasons supporting a mitigated the sentence. We have previously held that an excessive sentence claim in conjunction with an assertion that the court failed to consider mitigating factors raises a substantial question. **White**, 193 A.3d at 983 (quoting **Commonwealth v. Caldwell**, 117 A.3d 763, 769-70 (Pa.Super. 2015) (*en banc*)).[2] Guerra has therefore raised a substantial question warranting our review, and we will allow the appeal.

However, in relation to Guerra's claim that the sentencing court abused its discretion by employing an incorrect prior record score when calculating the Sentencing Guidelines ranges, we find the claim to be waived. In his Rule 1925(b) statement of errors raised on appeal, Guerra framed his sentencing issue simply as, "Whether the Court abused its discretion in Sentencing the Defendant to an aggregate period of incarceration of 37 to 74 years." Pa.R.A.P. 1925(b) Statement, 11/27/17, at 2 (unpaginated). Although in its Rule 1925(a) opinion, the trial court acknowledged that it departed from the Sentencing Guidelines when sentencing Guerra, and that it calculated the

---

[2] We have also noted that "prior decisions from this Court involving whether a substantial question has been raised by claims that the sentencing court 'failed to consider' or 'failed to adequately consider' sentencing factors has been less than a model of clarity and consistency." **White**, 193 A.3d at 983 (quoting **Caldwell**, 117 A.3d at 769-70).

Guidelines ranges based on a prior record score of 5, the court did not address Guerra's claim that the prior record score was incorrect.

We conclude that the trial court's failure to address the calculation of Guerra's prior record score was a direct result of Guerra's failure to specify that issue in his Rule 1925(b) statement. When a vague Rule 1925(b) statement leaves a trial court to speculate as to the bases for relief, a finding of waiver is warranted. **Commonwealth v. Hodges**, 193 A.3d 428, 432 (Pa.Super. 2018); **see also Commonwealth v. Pukowsky**, 147 A.3d 1229, 1236 (Pa.Super. 2016) ("A Rule 1925(b) statement 'which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no [Rule 1925(b)] Statement at all,' and will result in waiver") (citation omitted). The absence of the trial court's opinion on the issue has hindered our review, and therefore we will not consider the waived issue of Guerra's prior record score.

Returning to Guerra's preserved sentencing issue, Guerra argues that his sentence of 37-74 years' incarceration, consisting of consecutive sentences above the Guidelines ranges, was excessive in light of the mitigating evidence, which the court ignored. Specifically, Guerra contends that the following factors should have mitigated his sentence: he chose to be tried without a jury; he admitted to committing several of the crimes charged, "essentially only contesting his involvement in a corrupt organization and his involvement with the minor victim"; and, during allocution, he took responsibility for his actions and apologized for being short-sighted and selfish, and stated that he

completed the WINGS program while in prison. Guerra's Br. at 43. Guerra also argues that the sentence is excessive because its length "will ensure the likelihood that [Guerra will] probably never be released from incarceration." *Id.* at 41.

"Sentencing is a matter vested in the sound discretion of the sentencing judge." ***Commonwealth v. Peck***, 2019 PA Super 8 (Jan. 8, 2019) (quoting ***Commonwealth v. Sheller***, 961 A.2d 187, 190 (Pa.Super. 2008)). The Sentencing Guidelines offer recommended ranges for sentence lengths, and a court may depart from the sentence recommended by the Guidelines if necessary. *Id.* An appellate court must vacate a sentence outside the Guidelines if the sentence is "unreasonable." *Id.*; *see also* 42 Pa.C.S.A. § 9781(c)(3).

In its opinion, the court stated that it explained on the record at the time of sentencing its reasons for sentencing Guerra above the Guidelines, including the effect of the crimes on the victims, the danger Guerra poses to the community, and Guerra's four-year flight from police. *See* Tr. Ct. Op. at 61 (quoting N.T., 5/4/17 (Sentencing), at 28-29). The court further commented that it considered all relevant factors in imposing an above Guidelines sentence, including Guerra's personal characteristics, such as his contrition and potential for rehabilitation; the court specifically noted Guerra's laughter during the testimony of a Commonwealth witness. *Id.* at 63. The court also reviewed the gravity of the offenses, and explained that it purposefully sentenced Guerra to consecutive sentences, as Guerra was not

entitled to a "volume discount" for the quantity of crimes he committed. *Id.* at 61-62, 64-65. Moreover, the trial court had the benefit of a pre-sentence investigation report at the time of sentencing. *See Commonwealth v. Finnecy*, 135 A.3d 1028, 1038 (Pa.Super. 2016) (we presume court was aware of relevant sentencing information when it had the benefit of a presentence investigation report).

We therefore find no basis to Guerra's claim that his sentence was excessive or that the court failed to consider mitigating evidence. We perceive no abuse of discretion or unreasonableness in the court's sentence, and affirm on the basis of the trial court opinion. *See* Tr. Ct. Op. at 58-65.

### III. Trooper Peterson's Testimony

In his third issue, Guerra argues that the court erred in overruling his objection when Trooper Peterson testified he believed Guerra was the head of an organization. Guerra's Br. at 47. Guerra points out that the Commonwealth asked Trooper Peterson about his training and experience in the Organized Crime Unit before asking his opinion as to why there was no financial trail implicating Guerra in the crimes. According to Guerra, Trooper Peterson's testimony was not sufficient to allow a lay person to conclude that Guerra was the head of an organization, but was instead based on the Trooper's specialized knowledge, and therefore constituted impermissible expert testimony. *Id.*

"A trial court has broad discretion to determine whether evidence is admissible and a trial court's ruling on an evidentiary issue will be reversed

only if the court abused its discretion." ***Commonwealth v. Huggins***, 68 A.3d 962, 966 (Pa.Super. 2013) (quoting ***Commonwealth v. Cook***, 676 A.2d 639, 647 (Pa. 1996). We do not disturb a ruling admitting evidence "unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." ***Id.*** (quoting ***Commonwealth v. Minich***, 4 A.3d 1063, 1068 (Pa.Super. 2010)). As our scope of review over an evidentiary question is plenary, we may review the ruling within the context of the entire record. ***Id.***

Here, the trial court admitted the evidence because it was "rationally based on the witness's perception" rather than his technical knowledge. Tr. Ct. Op. at 67 (quoting Pa.R.E. 701(a)). The court likened the case to ***Commonwealth v. Blessitt***, 852 A.2d 1215 (Pa.Super. 2004) (*en banc*), *overruled on other grounds by* ***Commonwealth v. O'Berg***, 880 A.2d 597 (Pa. 2005). In ***Blessitt***, a Pennsylvania State Trooper who purchased drugs from the defendant in a controlled drug purchase opined at trial that the defendant had handed off the purchase-money to another individual before being arrested, because in the trooper's experience with controlled drug purchases, an individual selling drugs only "sometimes" still has that money when he is arrested. ***Id.*** at 1218. On appeal, we affirmed the admission of the lay testimony regarding controlled drug purchases. ***Id.***

While a lay witness may not testify based on scientific, technical, or other specialized knowledge beyond that of a layperson, ***see*** Pa.R.E. 701, 702, "[a] witness may state relevant facts known to him, because of experience,

- 13 -

even though he is not regarded as an expert whose opinion would be admissible on a hypothetical inquiry." ***Commonwealth v. Bennett***, 370 A.2d 373, 375 (Pa. 1977); ***see, e.g., Commonwealth. v. Grabowski***, 549 A.2d 145, 151 (Pa.Super. 1988) (holding lay witness who operated auto body shop competent to testify to his conclusion drawn from personal experience operating a body shop).

We agree with the trial court that Trooper Peterson's testimony did not rely on specialized or technical knowledge, and was within the realm of understanding of a layperson. Trooper Peterson's opinion that Guerra was the head of an organization was rationally based on his interviews with five women who had worked for Guerra, three of whom testified at trial. Likewise, his testimony that a head of an organization would not leave a financial trail was based on his personal experience, rather than technical knowledge.

We note Guerra has not appealed on the basis that Trooper Peterson's testimony was based in part upon inadmissible hearsay. Regardless, we presume that a judge, sitting as finder of fact in a non-jury trial, disregards inadmissible hearsay testimony. ***Commonwealth v. Dent***, 837 A.2d 571, 582 (Pa.Super. 2003). We therefore affirm the trial court's ruling on Guerra's objection to Trooper Peterson's testimony.

### IV. Testimony that Cromwell Threatened A.H.

In his final issue, Guerra argues the court erred in admitting A.H.'s testimony that Cromwell threatened her. Guerra's Br. at 50. While A.H. did not testify to any specific statements made by Cromwell, Guerra complains

that A.H. testified that Cromwell visited her parents, which scared her. Guerra contends that the testimony about Cromwell's actions was inadmissible because it was not relevant to the charges against Guerra, as there was no evidence establishing any conspiracy between Guerra and Cromwell existed at the time. Guerra also argues that A.H's testimony constituted double hearsay.

Guerra has waived review of this issue by failing to make a timely objection to the testimony at the time of trial. **See** Pa.R.E. 103(a)(1); **Commonwealth v. Bryant**, 855 A.2d 726, 740 (Pa. 2004). Were the issue not waived, we would agree with the trial court's analysis that the statements were properly admitted as statements by a co-conspirator in furtherance of a conspiracy. **See** Tr. Ct. Op. at 68-72. We add that A.H.'s testimony did not contain hearsay, as she did not testify as to any direct statements, or even the content of the statements, made by Cromwell to her parents. In addition, A.H.'s testimony was cumulative of the testimony of Trooper Peterson, who testified regarding Cromwell's visit to A.H.'s parents, testimony which Guerra does not challenge. **See** N.T., 6/29/16, at 76-77, 81-82, 91-93.

As none of Guerra's issues merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/8/19

Circulated 03/28/2019 11:27 AM

FILED

2018 APR 11 PM 3: 04

OFFICE OF JUDICIAL RECORDS
CRIMINAL DIVISION
FIRST JUDICIAL DISTRICT
OF PENNSYLVANIA

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
:
:     **CP-51-CR-11956-2014**
vs. :
:
:
JOHN GUERRA :

CP-51-CR-0011956-2014 Comm. v. Guerra, John C.
Opinion

8094386261

## OPINION

**KENNEDY, SEAN F., J.**                 **April 11, 2018**

John Guerra ("the Appellant") appeals from a judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his convictions for Trafficking of Persons – Minor (18 Pa.C.S.A. § 3002(a)); Trafficking of Persons (18 Pa.C.S.A. 3002(a)); Criminal Conspiracy to Traffic Persons (18 Pa.C.S.A. § 903); Sexual Exploitation of a Child (18 Pa.C.S.A. § 6320(a)); Corrupt Organizations (18 Pa.C.S.A. § 911(b)(1)); Sexual Abuse of a Child (18 Pa.C.S.A. § 6318(a)(5)); Promoting Prostitution – Own House of Prostitution (18 Pa.C.S.A. § 5902(b)(1); Possession with Intent to Distribute (35 Pa.C.S.A. § 780-113(a)(30)); Criminal Use of a Communication Facility (18 Pa.C.S.A. § 7512(a)); Corruption of a Minor (18 Pa.C.S.A. § 6301(a)(1)(i)); and Simple Assault (18 Pa.C.S.A.§ 2701(a)). The relevant facts and procedural history are as follows.

## FACTS

In February of 2009, information was provided to the Pennsylvania State Police by law enforcement officials in Montgomery County, Maryland regarding a prostitution ring that was being operated within their jurisdiction. After investigating, the Pennsylvania State Police began

an investigation into the activities of John Guerra. The Appellant recruited young, vulnerable women from areas within the City and County of Philadelphia for the purpose of engaging in prostitution.

M.S. left Pittsburgh for Philadelphia and was approached by another girl en route. N.T. 6/28/2016 at 54. This girl stated that M.S. should come with her and brought M.S. to a home in Philadelphia where she met the Appellant. The first night that M.S. met the Appellant, she informed him that she was addicted to crack cocaine. *Id* at 58. The Appellant approached M.S. with the proposition that she could work from him performing "dates" by posting advertisements online soliciting customers for sex. *Id* at 57. M.S. made it clear to The Appellant that she needed crack cocaine to survive daily and The Appellant responded that she could obtain narcotics through him. *Id* at 59.

The next day after their first meeting, The Appellant brought M.S. shopping for the purpose of purchasing clothing for the photos to be used in the advertisements. N.T. 6/28/2016 at 60. the Appellant and another girl took photos of M.S. and posted the advertisements to Craigslist. *Id*. M.S. was then brought to a hotel in Northeast Philadelphia to perform "dates." *Id* at 62. The advertisements that were posted contained a phone number for a phone that was given to M.S. by the Appellant for the purpose of scheduling "dates." *Id* at 68.

M.S. was earning upwards of $1,000 per day from sexual services that she advertised on Craigslist. M.S. did not keep this money and it was immediately given to the Appellant. N.T. 6/28/2016 at 67. In the initial stages of working for the Appellant, there was only one other man working with the Appellant, but as time went on the Appellant brought other people from New York to assist and expand the operation. *Id* at 71. These persons included Elton Cromwell, Eddie Mendez and Dwayne Thomas. *Id*. M.S. witnessed the Appellant giving narcotics to Cromwell

2

and after she performed dates would purchase more crack cocaine from Cromwell. *Id* at 75. M.S. also stated that the Appellant himself collected money after "dates" and distributed narcotics. *Id* at 76.

the Appellant engaged in a pattern of violence towards M.S. to keep her under his control. On the night of her 22nd birthday, M.S. had been awake for three straight days performing "dates" and was under the influence of crack cocaine. N.T. 6/28/2016 at 82. M.S. owed money to the Appellant from the previous three days. After she had been missing, the Appellant found M.S. in a hotel and severely beat M.S. in one hotel room and then brought her across the hall into the bathroom of a second hotel room where the beating continued. *Id* at 83. On another occasion, after the Appellant found M.S. in possession of missing money, he chased her around a hotel room with an extension cord and attempted to beat her with it. *Id* at 86. After catching M.S., the Appellant had forcible anal sex with M.S. and gave her heroin after the attack. *Id* at 86-87. M.S. was also sold to Jason the Appellant to work for him for some amount of time because Jason Guerra was having money problems and the Appellant was teaching Jason how to traffic girls. *Id* at 89.

In June 2008, victim T.W. encountered ex-boyfriend Eddie Mendez in a Target parking lot in Philadelphia. N.T. 6/29/2016 at 6-7. T.W. agreed to accompany Mendez back to a hotel room and entered his vehicle. *Id* at 7. While en route to the hotel, Mendez stopped and picked up John the Appellant. *Id*. Mendez brought T.W. to the Roosevelt Inn on Roosevelt Boulevard in the City and County of Philadelphia. *Id* at 8. Upon entering the room and observing two other girls, Mendez approached T.W. and sought to recruit her to work as a prostitute. *Id* at 9. The Appellant informed T.W. of the prices that she was to charge each customer for her sexual service and stated that she must "check in" with him before and after each customer. *Id* at 10.

3

The Appellant also provided T.W. with a pre-paid cellular phone for use to receive calls from customers. *Id* at 12.

The Appellant took pictures of T.W. for the purpose of creating advertisements to be placed on Craigslist and Backpage to solicit customers. N.T. 6/29/2016 at 13. After these pictures were taken, the Appellant posted the advertisements on Craigslist and Backpage. *Id* at 14. The online advertisements contained a picture of T.W. along with a phone number – for the phone given to T.W. by the Appellant – for the exclusive purpose of getting customers for her sexual services. At this time, the Appellant was renting two hotel rooms and would sleep in the hotel rooms with the girls that he had recruited. *Id* at 15. For her services, T.W. was never provided cash. *Id* at 43. Instead, she was taken to the mall each Sunday and permitted to spend $600 on items there. *Id*.

Like M.S., T.W. was victim to a pattern of physical abuse meant to instill compliance. One on occasion, the Appellant assaulted T.W. so severely that he left a bruise in the shape of his hand on T.W.'s face. N.T. 6/29/2016 at 28. The reason for this assault was because T.W. had left and attempted to work for the Appellant's brother. *Id*. After trying to leave the Appellant, T.W. was assaulted by the Appellant with such severity that T.W. had bruises that were visible around her ribs, experienced painful breathing and had a lump visible from these assaults. *Id* at 29 T.W. "wasn't allowed" to seek any medical treatment for these injuries. *Id*. Mendez and the Appellant would not allow T.W. to take days off from working. *Id* at 19.

On July 30, 2008, the minor victim – A.H. – was approached by the Appellant in a vehicle with Elton Cromwell in the Kensington neighborhood of Philadelphia. N.T. 6/28/2016 at 145. A.H. was a runaway that was homeless and living on the streets when approached by the Appellant. *Id*. The two men asked her which drugs she used and A.H. responded that she used

4

cocaine. *Id* at 148. After the Appellant promised her a place to stay, A.H. entered the vehicle and was taken to motel room. Once A.H. was brought to the hotel room and she observed it was occupied by multiple girls that she believed to be involved with prostitution. *Id* at 151, 157. The girls that had been present in the room exited the room upon their arrival and both Cromwell and the Appellant had sexual intercourse with the minor A.H. *Id* at 152. After A.H. had sexual intercourse with both the Appellant and Cromwell, they explained to A.H. that they would an advertisement for her and she would have to begin posting advertisements on Craigslist to solicit customers for sexual services. *Id* at 159. A.H. was provided a cellular telephone, for which she did not pay, whose number was placed into the Craigslist advertisements. Once A.H. began posting advertisements, she performed 10 to 15 dates per day, seven days per week, awake for multiple days at time from cocaine use and could never refuse customers. *Id* at 166-171. A.H. used a laptop that the Appellant stated was his laptop to make these postings. N.T. 6/29/2016 at 171. Initially, A.H. used a picture of herself from a MySpace account, but then used pictures that were taken of her by Cromwell. N.T. 6/28/2016 at 191. If one of the dates was to be performed off site from the hotel, A.H. was driven by a member of the organization. *Id* at 176.

A.H. would post multiple advertisements per day on websites to solicit customers. N.T. 6/28/2016 at 161. There were approximately ten other girls that were staying in two rooms that were rented by the Appellant. *Id* at 164. After performing sexual acts in exchange for money, A.H. would immediately give the money received to another member of the Appellant's organization. *Id* at 167. A.H. was never allowed to keep the money, but instead would receive crack cocaine; she used approximately $500 worth of crack cocaine per day in exchange for performing "dates." *Id* at 166. A.H. testified that she would receive the crack cocaine from either Cromwell or Eddie Mendez. *Id* at 168. A.H. was subjected to acts of violence to keep her in line;

5

this included punches to the upper torso called "ribshots." *Id* at 172-73. A.H. witnessed acts of violence by the Appellant towards other women and was scared of him. *Id* at 180. A.H. witnessed the Appellant hit another victim that worked for him and heard him viciously assault another taking place in the hotel room above hers. *Id* at 174, 176.

At one point, it was soon discovered that A.H. was a minor during her work for the Appellant. The girls that had been staying in the same hotel room with A.H., Cromwell and the Appellant all packed their belongings. N.T. 6/28/2016 at 182. A.H. was then taken to the Appellant's family home on Tackawanna Street in Philadelphia while waiting for a decision on how to proceed. *Id* at 183. The decision was ultimately left to the Appellant whether or not A.H. would come back and continue working as a prostitute. *Id* at 196. The Appellant decided to allow A.H. to continue working, and after a few days at his family's home, picked up A.H. and brought her back to the hotel. *Id* at 184. A.H. continued working for the Appellant and he made no effort to contact A.H's family or tell A.H. to no longer prostitute herself.

The Appellant was the head of an organization that recruited and preyed upon vulnerable girls. The girls were forced to perform upwards of ten to fifteen dates per day. N.T. 6/28/2016 at 171. The organization included at least three other persons identified as Elton Cromwell, Eddie Mendez and Dwayne Thomas. There existed a structure within the organization with Cromwell and Mendez described as puppets and taking orders from the Appellant. N.T. 6/29/2016 at 19-20. Mendez was also a driver for all the girls within the organization and drove them to meet customers for sexual services when the encounters did not take place at the hotel. N.T. 6/28/2016 at 187. Early in the organization's history the Appellant would collect the money the girls made himself; however, as time moved forward and other people became involved in the organization the the Appellant employees collected the money instead. *Id* at 80. The Appellant was directly

6

responsible for distributing narcotics to these vulnerable girls. The Appellant was fully aware these girls suffered from substance abuse issues because the girls were asked about their drug use within minutes of encountering him. N.T. 6/28/2016 at 59, 148. The Appellant supplied these girls with large amounts both crack cocaine and heroin. N.T. 6/29/2016 at 184. One victim that did not use narcotics was permitted to spend $600.00 every Sunday at the mall, but was never permitted to hold the cash or be paid in cash. N.T. 6/29/2016 at 43. The Appellant headed an organization that preyed on vulnerable girls, demanded behavior consistent with his expectations or face violence and had multiple employees working for him to oversee and control the operation.

## PROCEDURAL HISTORY

The Appellant was charged in December, 2010 as the result of an investigation being submitted to the Statewide Investigating Grand Jury. The Appellant then became a fugitive from justice until his apprehension by troopers from the Pennsylvania State Police Organized Crime Unit in August, 2014. On October 21, 2014, a preliminary hearing was held, at which his charges were held for court. On November 11, 2014, he was formally arraigned on his charges.

The Appellant remained in custody until his bench trial began on June 28, 2016 before the Honorable Sean F. Kennedy. On June 29, 2016, he was convicted at his bench trial of all thirteen counts. On May 4, 2017, the Appellant was sentenced by the Honorable Sean F. Kennedy to a total term of 37-74 years confinement. On May 5, 2017, the Appellant filed a timely post-sentence motion. On September 5, 2017, the Appellant's post-sentence motion was denied by operation of law. On September 29, 2017, he filed a timely Notice of Appeal to the Superior Court of Pennsylvania.

7

## MATTERS COMPLAINED ON APPEAL

The Appellant's 1925(b) asserts:

1. Whether the evidence was sufficient to find Appellant guilty of Possession with Intent to Distribute in violation of 35 Pa.C.S.A. § 780-113(a)(30); Corrupt Organization in violation of 18 Pa.C.S.A. § 911(b)(1); Conspiracy – Trafficking of Persons in violation of 18 Pa.C.S.A. § 903; Sexual Exploitation of Children in violation of 18 Pa.C.S.A. § 6320(a); Criminal Use of a Communication Facility in violation of 18 Pa.C.S.A. § 7512(a); Promoting Prostitution – Own House of Prostitution in violation of 18 Pa.C.S.A. § 5902 (b)(1); Corruption of Minors in violation of 18 Pa.C.S.A. § 6301(a)(1)(i); Simple Assault in violation of 18 Pa.C.S.A. § 2701(a); Trafficking of Persons (2 counts) in violation of 18 Pa.C.S.A. § 3002(a); and Sexual Abuse of a Minor in violation of 18 Pa.C.S.A. § 6318(a)(5) beyond a reasonable doubt.

2. Whether the verdict was against the weight of the evidence.

3. Whether the Court abused its discretion in Sentencing the Appellant to an aggregate period of 37 to 74 years.

4. Whether the Court erred in permitting the investigating officer to testify as to his opinion that the Appellant was the head of a corrupt organization thereby depriving Appellant of a fair trial.

5. Whether the Court erred in allowing testimony elicited by the Commonwealth involving an alleged threat by Elton Cromwell against a witness testifying against the Appellant without establishing any connective link to the Appellant.

6. Whether the Court erred in allowing testimony from Commonwealth's witness (M.S.) to testify as to uncharged conduct, specifically, that the Appellant anally raped her and strangled her without providing defense counsel with prior Notice of Intent to Admit Prior Bad Acts pursuant to PA Rule of Evidence 404(b) thereby depriving the Appellant of a fair trial.

7. Whether the Court erred in allowing testimony from Commonwealth's witness (A.H.) to testify as to uncharged conduct, specifically, that the Appellant raped her knowing that she was a minor without providing defense counsel with prior Notice of Intent to Admit Prior Bad Acts pursuant to PA Rule of Evidence 404(b) thereby depriving Appellant of a fair trial.

## DISCUSSION

### I. Sufficiency Claim – The evidence presented at trial was sufficient to find guilt beyond a reasonable doubt on all charges.

In his first principle point of appeal, the Appellant incorrectly asserts that the evidence was insufficient to sustain his convictions on all counts. For myriad of reasons, the sufficiency claims asserted by Mr. the Appellant as to all charges are without merit. The trial court will

8

discuss the evidentiary sufficiency for each conviction. The appellate scope of review of a challenge to the sufficiency of the evidence is well-established. The appellate court must review the evidence in the light most favorable to the verdict winner to determine whether there is sufficient evidence to allow a jury to find every element of a crime beyond a reasonable doubt. The Superior Court has further held that:

> In applying the above test, [the appellate court] may not weigh the evidence and substitute [its] judgment for the fact-finder. In addition, [the appellate court] notes that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Tejada*, 107 A.3d 788, 792-93 (Pa. Super. 2015). The facts and circumstances established by the Commonwealth need not "be absolutely incompatible with the defendant's innocence." *See Commonwealth v. Aguado*, 760 A.2d 1181, 1185 (Pa. Super. 2000). Where no single bit of evidence "will by itself conclusively establish guilt, the verdict will be sustained where the totality of the evidence supports the finding of guilt." *Commonwealth v. Thomas*, 561 A.2d 699, 704 (Pa. 1989).

Thus, our appellate courts have recognized that proof of guilt may be inferred entirely from evidence of circumstances that attended the commission of the crime. *See Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa. Super. 2005). The "fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of

9

innocence." *Id.* Nevertheless, the requirement of the law remains that in order to secure a conviction, the "facts and circumstances proved must be of such a character as to produce a moral certainty of the guilt of the accused beyond any reasonable doubt." *Commonwealth v. Bybel*, 611 A.2d 188, 189 (Pa. 1992). Finally, an appellate court will review the entire trial record, even evidence which is impermissibly introduced, when evaluating a sufficiency claim. *See Commonwealth v. Sanders*, 42 A.3d 325, 329 n.1 (Pa. Super. 2012).

The trial court believes the entire record more than adequately meets the necessary threshold to establish each element of every charged offense has been proven beyond a reasonable doubt. For reasons that follow, the claims by the Appellant fail and each is without merit.

### a. Possession with Intent to Deliver

The Appellant first raises the claim that the evidence was insufficient to sustain his conviction for Possession with Intent to Deliver. The trial court disagrees. To sustain a conviction for PWID, the Commonwealth "must prove both the possession of the controlled substance and the intent to deliver the controlled substance." *Commonwealth v. Lee*, 956 A.2d 1024, 1028 (Pa. Super. 2008). At trial, there was extensive testimony presented from victim M.S. where she stated that she received crack cocaine directly from Mr. the Appellant and would receive disproportionately low amounts of narcotics compared to the money she had paid. N.T. 6/28/2016 at 74-75. For instance, M.S. testified that she if she paid $120 to the Appellant, she would only receive $20 of crack cocaine in return. *Id* at 75. This would, in turn, force M.S. to work more frequently, or have more "dates," for the Appellant in order to satisfy her daily drug habit.

10

Perhaps the most convincing testimony supporting the sufficiency of the evidence for the PWID conviction comes from the Appellant himself. The Appellant stated that around the time of the charged events he sold both crack cocaine and heroin. N.T. 06/29/2018 at 184. The Appellant admitted that he "started picking [narcotics] up in large quantities so that it would be cheaper." *Id.* The Appellant then testified he would purchase approximately $500 worth of heroin at a time, break it down and sell to the girls and make a profit. *Id* at 185-86. The Appellant also testified that he would purchase approximately $100 of crack cocaine for distribution amongst the girls he had in his employ. *Id* at 186. The Appellant plainly stated he "would go down to Kensington and buy it . . . So [the Appellant] would go down to Kensington Ave and get it. [The Appellant would] come back up, you know. And then when [he] g[a]ve it to them, they g[a]ve [the Appellant] the money that they ha[d]." N.T. 06/29/2016 at 173. Alternatively stated, the Appellant would purchase illegal narcotics and sell the controlled substances to the girls working for him at the hotels.

The Appellant attempts justification for his distribution of controlled substances to the victims through claims he was attempting to protect the girls from the dangers of the streets. Perhaps, the Appellant fails to consider the possibility he is one very such danger from which he sought to protect the girls. The Appellant stated that it was "safer for them to stay at the hotel room." N.T. 6/28/2016 at 187. However, in the same breath, the Appellant stated that he "wasn't making money off of crack from giving it to them. I was making money off the dope." and that the girls did not want to procure narcotics themselves from certain areas because "people get locked up and you get beat up. You know, they got robbed." *Id.* The trial court duly notes the seemingly personal hardship he must have endured in only profiting from the sales of <u>one</u> controlled substance to the victims. However, in his quest for benevolence, the Appellant meets

11

the two necessary elements for conviction of PWID through his possession of a controlled substance and the intent to distribute the controlled substance. Therefore, the trial court did not err in finding there was sufficient evidence to prove the two elements needed for conviction beyond a reasonable doubt.

### b. Corrupt Organizations

The Appellant next challenges the sufficiency of the evidence supporting his conviction for corrupt organizations. To secure a conviction under the charged subsection of the Corrupt Organizations Act, the Commonwealth must prove a defendant received income, either directly or indirectly, from a pattern of racketeering activity in which the defendant participated as a principal to use or invest, directly or indirectly, any part or proceeds of such income in the acquisition of any interest in, or the establishment or operation of, any enterprise. 18 Pa.C.S.A. § 911(b)(1). A pattern of racketeering activity is defined as a "course of conduct requiring two or more acts of racketeering activity." 18 Pa.C.S.A. § 911(h)(4). A non-exhaustive list of racketeering activity, in relevant part, can include acts indictable under Chapter 30, relating to human trafficking, of the Crimes Code; an offense indictable under section 13 of the act of April 14, 1972, known as The Controlled Substance, Drug, Device, and Cosmetic Act (relating to the sale and dispensing of narcotic drugs; or a conspiracy to commit any of the offenses set forth in subparagraph (i) or (ii). 18 Pa.C.S.A. § 911(h)(1)(i)-(iii). Further, an enterprise is defined as any "individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S.A. § 911(h)(3).

First, the Appellant engaged in a pattern of racketeering activity. Again, racketeering activity is defined as "any offense indictable under Chapter 30 of Title 18 (relating to human

12

trafficking)." 18 Pa.C.S.A. § 911(h)(1)(i). Racketeering activity as also defined as "any offense indictable under [the Controlled Substances Act]." 18 Pa.C.S.A. § 911(h)(1)(ii). Racketeering activity also occurs where there is any conspiracy to commit any of the offenses set forth at subsections (i) and (ii). The trafficking of persons, both of adults and a minor in this case, is indictable under Chapter 30 of the Crimes Code; consequently, the trafficking of persons is "racketeering activity." The Appellant trafficked in one minor person, A.H., and at least two persons over age 18, M.S. and T.W. Likewise, the possession with the intent to distribute narcotics is indictable under the Controlled Substances Act; thus, also making such an offense "racketeering activity." By his own admission, the Appellant possessed controlled substances with the intent to distribute the narcotics. N.T. 6/29/2016 at 173. Further, a conspiracy to commit any offense set forth in subparagraphs (i) or (ii) of the Corrupt Organizations Act constitutes racketeering activity. The Appellant's involvement in the conspiracy to traffic persons is considered "racketeering activity." All of these acts constitute a "pattern of racketeering activity" pursuant to the definition provided in the Corrupt Organizations Act.

The Commonwealth is also required to establish that the Appellant received income from his pattern of racketeering. The first "racketeering activity" from which the Appellant drew income stemmed from his trafficking of persons through forced labor. The trial court will later discuss in greater detail the specifics of his engaging in trafficking of persons. However, for the purposes of demonstrating the Appellant drew a profit from trafficking of persons through forced labor, the very poignant testimony of T.W. demonstrates how the Appellant drew his income from the forced labor:

13

Commonwealth: And after each date, were you directed to something specific with the money that you got?

T.W.: Either hand it to whichever guy was in the room – it would either be [the Appellant], Eddie or – when [Cromwell] came along, it would be [Cromwell].
Commonwealth: And so . . . how much money would you estimate you were making a day?

T.W.: About a thousand.

Commonwealth: Did you ever try to take any days off?
T.W.: You weren't allowed.

Commonwealth: When you say "you weren't allowed to," who wouldn't allow you?

T.W.: Eddie or [the Appellant] wouldn't allow you to.

N.T. 6/29/2016 at 19. T.W. further stated that both Eddie Mendez and Elton "Marvin" Cromwell took orders directly from the Appellant. *Id* at 20. The minor victim, A.H., also offered similar testimony that she would give her money to the driver that brought her to a location and the drivers subsequently gave that money to the Appellant. N.T. 06/28/2016 at 204. The record reflects that: (1) the Appellant, and not the girls themselves, drew the income from the sexual encounters the girls earned; and (2) the fact he did not "allow" the girls days off epitomizes the concept of forced labor. Therefore, it can be concluded that the Appellant received income through the "racketeering activity" of trafficking in persons.

The next "racketeering activity" from which the Appellant drew income was through his possession of a controlled substance with the intention to distribute it. One victim, M.S., testified at trial how after performing a date she would pay $120 for crack cocaine, but would just receive around $20 worth of the controlled substance. N.T. 6/28/2016 at 75. M.S. further testified that she witnessed Elton Cromwell and other persons getting the crack cocaine to be sold to them from the Appellant. *Id* at 74. The minor victim, A.H., testified that she received crack cocaine

from Cromwell after each date and purchased around $500 of crack cocaine per day. *Id* at 166. The next logical step given this testimony from A.H. is provided by M.S. that she witnessed the Appellant giving controlled substances to Cromwell for distribution and sale among the girl. It follows that the crack cocaine purchased from Cromwell by A.H. likely came from the Appellant. Finally, the testimony from the Appellant himself points towards his making a profit through his distribution of controlled substances. The Appellant testified that around the time of the charged events he sold both crack cocaine and heroin. N.T. 06/29/2018 at 184. The Appellant admitted that he "started picking [narcotics] up in large quantities so that it would be cheaper." *Id.* The Appellant then testified he would purchase approximately $500 worth of heroin at a time, break it down and sell to the girls and make a profit. *Id* at 185-86. In short, the Appellant plainly admits to making a profit from the distribution of narcotics. Therefore, it can be concluded that the Appellant received income through the "racketeering activity" of possessing a controlled substance with the intention to distribute the controlled substance.

Second, having concluded that the Appellant engaged in a pattern racketeering activity, the trial court next turns to the question of whether an enterprise existed within the meaning of the Corrupt Organizations Act. The Appellant's organization was formed for the purpose of trafficking persons and providing sexual services at the behest of his victims constitutes an "enterprise," which is defined as any "individual, partnership, corporation, association . . . and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities." 18 Pa.C.S.A. § 911(h)(3). Trooper Michael Peterson described the Appellant's operation as "organized crime." N.T. 6/29/2016 at 103. There was, in fact, an organized effort in the Appellant's management of his criminal enterprise, with himself at the top. Investigation revealed that he had at least three other

15

people working for him in this enterprise: Elton "Marvin" Cromwell, Eddie Mendez, and Dwayne Thomas. *Id* at 65. The victims working for the Appellant also confirmed this command structure. There exists little dispute that Eddie worked as a driver for the Appellant by transporting girls to meet customers. The minor victim, A.H., testified that Eddie worked for the Appellant and drove her to meet customers. N.T. 6/28/2016 at 187. Victim M.S. also testified that Eddie drove her places. *Id* at 126. The Appellant himself admitted that he paid Eddie Mendez $50 each time he drove one of the girls to meet a customer. N.T. 6/29/2016 at 202. M.S. testified that she believed the Appellant was in charge of Cromwell, Eddie Mendez and Dwayne Thomas. N.T. 6/28/2016 at 72. The minor victim, A.H., also testified that Dwayne Thomas worked for the Appellant. *Id* at 188. A.H. also testified that she witnessed Cromwell taking orders from the Appellant. *Id* at 196. Thus, there was a group of individuals engaged in commerce, providing forced sexual labor, whose sole purpose was to generate income from the victims.

Third, the trial court is required to determine whether the income from the Appellant's "pattern of racketeering activity" was used in the establishment or operation of the enterprise. The trial court has little doubt the income received from the "racketeering activity" was used to establish or maintain the enterprise. For example, nothing in the record states that the Appellant had any type of legitimate employment during this time. However, there is testimony from the Appellant stating that he paid rent for two homes; one home was rented for $500 per month and the second was rented for $650 per month. N.T. 6/29/2016 at 175. One of the homes, the one located on Tackawanna Street, was the home to which A.H. was brought after the Appellant discovered her true age. The Appellant further testified that he "always had girls at the hotel ready. So if you wanted to be at the house, you could be at the house. If you wanted to go to the

16

hotel, you'd go to the hotel." *Id* at 176. Regarding the house, he stated that the girls "needed a place to stay when they wasn't working. So they asked if I could get a house and stuff like that. That was the purpose behind that." *Id* at 175.

Next, M.S. testified that Cromwell, Dwayne "D-Boy" Thomas, and Eddie "were like [the Appellant's] people, and, like, [the Appellant] came and brought them down there so, like, they could make money and, like, expand . . . I mean the more you branch out and like have more girls." N.T. 6/28/2016 at 73. M.S. testified that in the beginning there was only the Appellant and another man, named Dre, but slowly "other people were coming down from New York. And then, like, they would end up with like a girl. Like, [the Appellant] would put them somewhere in the hotel with us." *Id* at 71. The Appellant started with a small number of people and as his enterprise grew, he reinvested the money collected from the trafficked victims to bring additional persons and recruiting more victims.

There are expenses that come with the operation of a human trafficking ring: the costs to post advertisements online, the renting of hotel rooms, payment for food and other goods for the girls. T.W. testified that early in the operation she did not post, or pay for, the advertisements online herself; rather, T.W. testified that the Appellant was responsible for the payment and posting of advertisements. N.T. 6/28/2016 at 14. M.S. testified that all money was eventually given to the Appellant and that if she "wanted to eat or like food was to be ordered, like, that never came out of my own pocket because, like, I never had my own cash . . . Because it was given to [the Appellant]. Like if I needed to do something or wanted to go do something, like get my nails done," then M.S. was required to ask the Appellant or one of his employees. *Id* at 66-67. The Commonwealth expert on trafficking in persons, Detective Stigerts, stated that the "business end of it is the girls make the money through their prostitution acts, and they provide

17

the money actually to the traffickers. The traffickers take care of all their expenses." *Id* at 36. Detective Stigerts testified that these expenses included posting the advertisements, renting hotel rooms, travel, food, drugs, and getting hair and nails done for the girls. *Id.*

There was sufficient testimony presented at trial to convict the Appellant on the charge of Corrupt Organizations. The Appellant engaged in a pattern of racketeering activity through his trafficking in persons and delivering controlled substances. There existed an enterprise, although illegitimate, through a group of persons whose objective was to engage in commerce. The income received from the pattern of racketeering activity was used to establish and maintain the enterprise. In fact, the testimony of the Commonwealth expert unsurprisingly struck very close to the behavior exhibited by the Appellant and he opined that the ultimate concerns of such traffickers are "making money and how much money can the girls make for them." N.T. 6/28/2016 at 35. The trial court is inclined to agree and, therefore, found the evidence presented at trial sufficient to convict the Appellant for Corrupt Organizations.

### c. Conspiracy – Trafficking Persons

The Appellant next contends that there was insufficient evidence to support his conviction for conspiracy. The Appellant was charged by the Commonwealth with conspiracy under three alternative theories: (1) conspiracy to traffic a minor person; (2) conspiracy to traffic persons; and (3) conspiracy for promoting prostitution. N.T. 06/29/2016 at 217. To sustain a conviction for criminal conspiracy, the Commonwealth must prove beyond a reasonable doubt that the defendant: (1) entered into an agreement to commit or aid in a criminal act with another person or persons; (2) with a shared criminal intent; and that (3) an overt act was done in furtherance of the conspiracy. 18 Pa.C.S.A. § 903; *See Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa. Super. 2011). The overt act necessary to establish criminal conspiracy need not be

18

committed by the defendant; it need only be committed by a co-conspirator. *See Commonwealth v. McCall*, 911 A.2d 992, 996 (Pa. Super. 2006). The conduct of the alleged parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. *Id.* The conspiratorial agreement "can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Id.*

Here, the Commonwealth charged the Appellant with criminal conspiracy. Regarding the charge of criminal conspiracy in particular, the Superior Court reiterated the following precepts:

> An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Johnson*, 719 A.2d 778, 785 (Pa. Super. 1998) (*en banc*), appeal denied, 739 A.2d 1056 (1999) (citations omitted). Therefore, where the conduct of the parties indicates that they were acting in concert with a corrupt purpose in view, the existence of a criminal conspiracy may properly be inferred. *Commonwealth v. Snyder*, 483 A.2d 933, 942 (Pa. Super. 1984). This court has held that the presence of the following non-exclusive list of circumstances when considered together and in the context of the crime may establish proof of a conspiracy: (1) an association between alleged conspirators, (2) knowledge of the commission of the crime, (3) presence at the scene of the crime, and (4) participation in the object of the conspiracy. *Commonwealth v. Swerdlow*, 636 A.2d 1173, 1177 (Pa. Super. 1994).

*Commonwealth v. Kinard*, 95 A.3d 279, 293 (Pa. Super. 2014). The trial court will address the conspiracy to traffic a minor as this was the conspiracy charge under which the Appellant was sentenced.

Although an explicit or formal agreement can seldom be proved, direct testimony was presented at trial that illuminates the existence of such an agreement. For instance, at trial, witness M.S. gave the following testimony:

19

> Defense Counsel: Did you ever hear [the Appellant] and [Cromwell] agree to any kind of criminal enterprise?
>
> M.S.: Yes. Like, he showed [Cromwell] – like, Here's this girl, like, and this is what we're doing down here and like, now, you're in on it and, like, this is what we do. Yes.

N.T. 06/28/2016 at 124. This testimony in itself vocalizes, and demonstrates, the existence of a conspiracy. The testimony from M.S. provides evidence of a conspiracy to traffic persons in a formal agreement. However, further discussion is required to ascertain the true depths of the conspiracy – namely, whether the parties acted in concert with one another to traffic a minor, had the shared criminal intent and committed an overt act.

Regarding the minor, A.H., there was extensive testimony at trial to implicate the Appellant in a conspiracy to traffic a minor. Initially, when A.H. first came into contact with Cromwell and the Appellant, she was walking down Kensington Avenue when she was approached by both men riding in the same car. *Id* at 147. After A.H. got into the vehicle, she was asked what drugs she used and told them she used cocaine. *Id* at 148. After getting into the vehicle, the Appellant and Cromwell brought A.H. to a room at the Ramada Inn on Roosevelt Boulevard that was occupied by a number of girls, who A.H. understood to be prostitutes, who left upon their arrival. *Id* at 150. Afterwards. A.H. had sexual intercourse with both the Appellant and Cromwell while the other remained in the room. *Id* at 157. Shortly thereafter, A.H. began working as a prostitute and used cocaine in between dates. A.H. stated that while she would have solicitors for her services come to her hotel room, Cromwell would go to the Appellant's room to wait while she finished. *Id* at 164. A.H. testified during trial that although she usually gave the money she earned from dates to Cromwell, or Elton Cromwell, there may have been occasion she "maybe" witnessed Cromwell giving the money to the Appellant. N.T. 06/28/2016 at 167. At another point in her testimony, A.H. stated that she witnessed the "drivers" give money to the

20

Appellant and that Cromwell used the same driver as the Appellant. *Id* at 204. Further, A.H. testified that she witnessed Cromwell taking orders from the Appellant. *Id* at 196.

Perhaps the most cogent argument to inculpate the Appellant in the conspiracy to traffic a minor comes after his discovery of her true age. There appears to be no factual dispute that until a certain time, A.H. had misrepresented her age until her minor status was discovered. At that time, A.H. directly informed the Appellant that she was, in fact, a minor and his response was to tell A.H. to "pack up [her] stuff and [the Appellant] was going to let [A.H.] stay at his wife's house for a couple days." N.T. 06/28/2016 at 182. A.H. further stated that while she, the Appellant and Cromwell were in the hotel room after the discovery of her age she "remember[ed] it being left up to John whether they [the Appellant and Cromwell] were going to keep me after finding out how old I was." *Id* at 197. After the Appellant took A.H. to his wife's house, he did not tell A.H. that he wanted nothing to do with an underage prostitute, did not tell A.H. that she should return home, and did not try to contact A.H.'s parents. *Id* at 195. Alternatively stated, the Appellant did nothing to prevent A.H. from continuing work for him and failed to tell A.H. to cease working for him. Subsequent to A.H. having spent time at the Appellant's home on Tackawanna Street, A.H. was picked up from the residence and driven back to a hotel by both Cromwell and the Appellant. N.T. 06/28/2016 at 184.

Addressing the four factors laid out in *Kinard*, the Appellant participated fully in the commission of conspiracy to traffic a minor. One victim, A.H., described the Appellant and Cromwell as being "good friends," and operated what could be labeled a business. N.T. 06/28/2016 at 186, 195. Mr. Cromwell was known to take orders from the Appellant. *Id* at 196. Under the second factor present in *Kinard*, the Appellant had full knowledge about the crime. The Appellant made the decision, after allowing A.H. to stay at his home, to return A.H. to the

21

hotel with Cromwell under the assumption she would begin working again. In fact, Cromwell looked to the Appellant to make a decision on how to handle the situation after discovering that A.H. was a minor.

The basic elements for conviction of Criminal Conspiracy under 18 Pa.C.S.A. § 903 require a demonstration that two or more persons: (1) entered into an agreement to commit or aid in a criminal act with another person or persons; (2) with a shared criminal intent; and that (3) an overt act was done in furtherance of the conspiracy. The Commonwealth proved the existence of an agreement beyond a reasonable doubt. The Commonwealth had one witness, M.S., present when such an agreement was made. However, inferences to the Appellant's agreement to commit the criminal act may also be drawn from the Appellant's presence at the hotel, his presence when recruiting victims to be trafficked and his position as the head of the organization. Next, the Commonwealth demonstrated a shared criminal intent when the Appellant, with Elton Cromwell, picked up A.H. from his family home and brought her back to the hotel to continue her work in prostitution. The shared criminal intent may also be inferred from the distribution of narcotics that the Appellant picked up for use by other victims that the Appellant claims does not work for him. Finally, the overt act done in furtherance of the conspiracy was completed when the Appellant picked up A.H. for the first time and recruited her for prostitution; or alternatively, the overt act can be inferred from when he brought A.H. back to the hotel for the express purpose of continuing her work in prostitution. There existed a network designed and operated by the Appellant that included drivers for transporting A.H., and other trafficking victims, to other locations to meet customers for sexual services. Within the network and organization headed by the Appellant, there were individuals assigned to collect money from the trafficking victims after "dates" and for the distribution of narcotics. A.H. was exposed to – and worked within the

22

conspiracy headed by the Appellant – the drivers, the individuals who collected her money, gave her narcotics, provided her cellular phones, and provided money for A.H. to post advertisements.

Here, the entire record more than adequately supports a finding that the evidence was sufficient at trial to sustain a conviction for conspiracy to traffic a minor. It would be orthogonal to logic and reason to find the Appellant was somehow insulated or unaware of the victim's minority status. After a brief respite at his home, A.H. was returned to the hotel to continue the work for which she was recruited. Therefore, the Commonwealth presented sufficient evidence to prove each required element of Criminal Conspiracy beyond a reasonable doubt.

### d. Sexual Exploitation of Children

The Appellant next contends the evidence presented at trial was insufficient to sustain a conviction for sexual exploitation of children. The crime of Sexual Exploitation of Children is defined in the Crimes Code as:

> § 6320. Sexual Exploitation of Children.
>
>> (a) Offense Defined – A person commits the offense of sexual exploitation of children if he procures for another person a child under 18 years of age for the purpose of sexual exploitation.
>> ...
>> (c) Definitions – As used in this section, the following words and phrases shall have the meanings given to them in this subsection:
>>> "Procure." To obtain or make available for sexual exploitation.
>>> "Sexual Exploitation." Actual or simulated sexual activity or nudity arranged for the purpose of sexual stimulation or gratification of any person.

18 Pa.C.S.A. § 6320(a)(c). Therefore, the Commonwealth must prove that a defendant: (1) obtained or made available a person under 18 years of age; (2) for the purpose of any actual or simulated sexual activity for the purpose of sexual stimulation or gratification of any person.

23

Here, there is sufficient evidence in the record to support the Appellant's conviction for sexual exploitation of children. The first night that the Appellant and Cromwell encountered A.H., a person under 18 years of age, they "told [A.H.] that they would post an ad for me and that I could work for them to stay there." N.T. 6/28/2016 at 159. A.H. further clarified and stated that the advertisements would be posted on Craigslist for erotic services. *Id.* A.H. defined erotic services as having sexual intercourse with customers in exchange for money. *Id.* These Craigslist and Backpage advertisements were posted multiple times per day with photographs of A.H. and included a phone number for customers to contact A.H. for her sexual services. *Id* at 161. M.S. testified that she knew A.H., a minor, was performing sex acts for money. N.T. 6/28/2016 at 133-34. M.S. further testified that she witnessed A.H. giving the money earned from these sex acts to Cromwell. *Id* at 134. There was testimony that Cromwell may have turned this money over to the Appellant. *Id* at 167.

Further, there is more than adequate testimony to support the Appellant's conviction for sexual exploitation of children corresponding to his actions after finding out A.H.'s true age. The Appellant told A.H. to "pack up [her] stuff and [the Appellant] was going to let [A.H.] stay at his wife's house for a couple days." N.T. 06/28/2016 at 182. After allowing a short number of days to pass, A.H. was picked up from the residence and driven back to a hotel by both Cromwell and the Appellant. *Id* at 184. A.H. returned to the hotel and continued to post advertisements online in soliciting customers to have sexual intercourse in exchange for currency. N.T. 6/29/2016 at 22. The Appellant did not tell A.H. that he wanted nothing to do with an underage prostitute, did not tell A.H. that she should return home, and did not try to contact A.H.'s parents. *Id* at 195. The conclusion that is drawn from these actions is that the Appellant had knowledge that A.H. was soliciting customers for sexual services in the hotel prior

24

to her stay at his home, and that without any intervention such conduct would continue after her return to the same hotel.

The Appellant made a minor available through posting her photograph in online advertisements with a phone number included through which customers contacted her. There may also be argument made that the Appellant made A.H. available for sexual exploitation through the rental of hotel rooms for A.H. to complete sexual acts with customers. A.H. was procured or made available "for another person" within the meaning of § 6320 because the online advertisements were directed towards any person who came upon A.H.'s advertisement on Craigslist or Backpage. There can be little dispute that the advertisements were for the purpose of "sexual exploitation" within the meaning of the statute. Again, sexual exploitation is defined as actual or simulated sexual activity for the sexual stimulation or gratification of another person. 18 Pa.C.S.A. § 6320(c). A.H. explicitly stated that the purpose of the advertisements was to solicit customers for sexual intercourse in exchange for money. N.T. 6/28/2016 at 159. These other persons contacted A.H. and subsequently had sexual intercourse with her. Therefore, the evidence is sufficient to sustain the Appellant's conviction for sexual exploitation of children.

### e. Criminal Use of a Communication Facility

In his fourth point of appeal concerning the sufficiency of the evidence, the Appellant contends the evidence was insufficient to sustain a conviction for criminal use of a communication facility. In addressing the Appellant's conviction of criminal use of a communication facility, the crime is defined in relevant part as follows:

> A person commits a felony of the third degree if that person uses a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title []. Every instance where the communication facility is utilized constitutes a separate offense under this section.

25

18 Pa.C.S.A. § 7512(a). A "communication facility" includes both a computer connected to the internet and telephones. 18 Pa.C.S.A. § 7512(c). Thus, to sustain a conviction under 18 Pa.C.S.A. § 7512, the Commonwealth must prove that a defendant intentionally, knowingly, or recklessly used a communication facility, and that, in doing so, the defendant intentionally, knowingly, or recklessly facilitated the commission or attempted commission of the underlying felony. *See Commonwealth v. Moss*, 852 A.2d 374, 381 (Pa. Super. 2004). Here, the Appellant testified during trial and admitted to several underlying felonies that would provide sufficient evidence to find the Appellant used a communication facility to facilitate the commission of an underlying felony. The trial court will discuss the Appellant's use of a communication facility as it relates to his conviction for the felony § 5902(b)(1) prostitution charge.

Here, there was extensive testimony from multiple witnesses, including the Appellant, at trial that inculpated the Appellant in the use of an internet connected computer and telephones to facilitate prostitution. One victim, M.S., testified that the Appellant took explicit photographs of her and posted her pictures on Craigslist, one prominent website used to draw customers, in advertisements to "get the phone calls." N.T. 6/28/2016 at 61. M.S. further testified that the Appellant is the person responsible for taking pictures, creating the advertisements, placing M.S.'s telephone number in the Craigslist advertisement to draw customers and making sure that M.S. answered these phone calls for potential dates. *Id* at 68.

In the next instance, another victim, T.W., testified to her experience with the Appellant and his facilitation of prostitution through a communication facility. T.W. explained that she was given a prepaid cellular phone by the Appellant and this phone number was placed into Craigslist advertisements by the Appellant for the purpose of organizing "dates" for T.W. N.T. 6/29/2016 at 12. The victim, T.W., also testified that the Appellant "took photos of [T.W.] and then put

26

them up [on Craigslist]." *Id.* The photographs that the Appellant took of T.W. at the Roosevelt Inn for the Craigslist advertisement were clearly for the purpose of drawing customers for sexual encounters as T.W. was "bent over the bed, and, like [her] backside towards the photos where [T.W.] was poking [her] butt out and leaning against the door." *Id* at 14. Thus, a second witness testified that the Appellant took explicit photographs of T.W. and was responsible for posting advertisements on Craigslist, embedded with the phone number for the prepaid phone provided by the Appellant, for the purpose of securing customers for T.W.

The third instance of the Appellant facilitating the commission of a felony, promoting prostitution, through a communication facility comes, once again, from the Appellant himself. The Appellant does not deny that victims M.S. and T.W. worked for him as prostitutes. N.T. 6/28/2016 at 166. The Appellant admits that he would direct the victims under his employment to post advertisements to websites soliciting customers; especially in cases where the girls may owe money to him. *Id* at 172. The Appellant also admits during his testimony that he took pictures of girls for the purpose of posting the picture on Craigslist and Backpage. *Id* at 200. Therefore, the Appellant admits to taking the photographs knowing that these photos would be used to solicit customers.

The elements for criminal use of a communication facility require the Commonwealth to prove the defendant used a communication facility to facilitate the commission of the underlying felony. Here, there was direct testimony from witnesses who confirmed that the Appellant was the person responsible for taking their pictures and using the provocative photographs in advertisements to seek customers for his escort service. Even under the defense theory that the Appellant himself did not post the advertisements, a theory which the trial court does not find credible, he still made laptops and cellular phones available to the girls to post advertisements for

27

their services. N.T. 6/29/2016 at 12, 171. There exists little doubt, clarified from the Appellant's own testimony, that the Appellant promoted prostitution. For instance, defense counsel concedes in closing that the defense has no argument to the felony prostitution charge. *Id* at 218. Additionally, defense counsel stated that there is no argument against the criminal use of communication facility with prostitution as the underlying felony. *Id.* Accordingly, there was sufficient evidence presented at trial that the Appellant facilitated the commission of a felony through a communication facility. Therefore, the trial court did not err in finding sufficient evidence was presented at trial to prove the elements of criminal use of a communication facility beyond a reasonable doubt.

### f. Promoting Prostitution – Own House of Prostitution

The Appellant, in his fifth point of appeal contests the sufficiency of the evidence for his conviction of Promoting Prostitution – Owning a House of Prostitution. In relevant part, the crime of promoting prostitution in the Crimes Code is defined as:

> b) Promoting prostitution.-- A person who knowingly promotes prostitution of another commits a misdemeanor or felony as provided in subsection (c) of this section. The following acts shall, without limitation of the foregoing, constitute promoting prostitution:
> (1) owning, controlling, managing, supervising or otherwise keeping, alone or in association with others, a house of prostitution or a prostitution business;

18 Pa.C.S.A. § 5902(b)(1). Regarding the elements of the crime of promoting prostitution, the Superior Court has stated that to sustain a conviction of promoting prostitution, the Commonwealth must prove beyond a reasonable doubt: (1) the existence of a prostitution business; and (2) that the accused actively participated in the "running, control, supervision, or keeping of the prostitution business." *See Commonwealth v. Dobrinoff*, 784 A.2d 145, 147-148 (Pa. Super. 2001). Prostitution is defined as "sexual relations for hire." *Dobrinoff*, 784 A.2d 148.

28

Furthermore, the appellate courts have found that a "business" is "a commercial activity engaged in for gain." *Commonwealth v. Potts,* 460 A.2d 1127, 1135 (Pa. Super. 1983) (defendant who agreed to engage in sexual activity and accepted an advance payment of $140 was engaged in prostitution as a business). Additionally, ownership and control of the building are not essential to a conviction; only the use of the building for the purpose of prostitution is required. *Commonwealth v. Michaelangelo,* 5 Pa. D. & C.2d 92, 94 (Pa. Beaver C. 1955).

Here, there was sufficient evidence to support the conviction of promoting prostitution beyond a reasonable doubt. The first element of the offense requires the existence of a prostitution business. The Appellant states that he was a pimp. N.T. 6/29/2016 at 166. He admits that he had upwards of eight women working for him as prostitutes. *Id* at 189. The Appellant admits that T.W. and M.S. worked as prostitutes for him. *Id* at 166. Two victims, M.S. and T.W., testified that they worked for the Appellant as prostitutes. This represents, for all intents and purposes, the existence of a prostitution business.

The second element of the offense requires that the Commonwealth prove that the Appellant participated in the "running, control, supervision, or keeping of the prostitution business." T.W. testified that the Appellant placed the advertisements online, took photos to place in the advertisements, gave her telephones to receive phone calls from customers, collected money from the victims after their "dates," and was in charge of the group including Eddie Mendez and Elton Cromwell. *Id* at 11, 13, 19, 32. M.S. testified that the first night she met the Appellant that she was told by the Appellant that she could work for him as a prostitute. N.T. 6/28/2016 at 57. M.S. testified that there were at least six girls working for the Appellant, that M.S. gave the money to the Appellant after each date and that he brought in additional persons to help expand the number of girls working for him *Id* at 65, 67, 73.

Given that the Appellant himself admits that he ran a prostitution business and was a pimp, it would appear logical to conclude that there existed a prostitution business and that the Appellant was involved in the management of the prostitution business. The testimony from victims M.S. and T.W. only serve as further evidence that the Appellant formed the prostitution ring and actively participated in the management of the business. Therefore, there was sufficient evidence presented at trial to support the Appellant's conviction for promoting prostitution beyond a reasonable doubt.

### g. Corruption of Minors

The Appellant asserts that the evidence presented by the Commonwealth at trial was insufficient to prove the necessary elements for conviction of Corruption of Minors beyond a reasonable doubt. The Appellant was convicted of Corruption of Minors defined in the Crimes Code as:

> § 6301. Corruption of Minors
>
> (a) Offense Defined.—
> (1) (i) Except as provided in subparagraph (ii), whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, commits a misdemeanor of the first degree.

18 Pa.C.S.A. § 6301. The Pennsylvania Superior Court in *Commonwealth v. Leatherby*, 116 A.3d 73, 82 (Pa. Super. 2015), expounded on the definition of the corruption of minors, holding, "[actions that] would offend the common sense of the community and the sense of decency, propriety and morality, which most people entertain," are those which shall be considered corrupting a minor. *Commonwealth v. Pankraz*, 554 A.2d 974, 977 (Pa. Super. 1989), quoting *Commonwealth v. Randall*, 133 A.2d 276 (Pa. Super. 1957).

30

Here, the Appellant was charged and convicted under § 6301(a)(1)(i). The first part of subsection (a)(1)(i) requires the defendant to perform any act "that "corrupts or tends to corrupt the morals of any minor less than 18 years of age." 18 Pa.C.S.A. § 6301(a)(1)(i). The requirement under § 6301(a)(1)(i) requires only the performance of any single act that corrupts or tends to corrupt a minor, and does not require more than a single act for conviction under this subsection. *See Commonwealth v. Kelly*, 102 A.3d 1025, 1033 (Pa. Super. 2014). The Appellant recruited the minor, A.H., for the purpose of engaging in prostitution. There was evidence presented at trial that the Appellant and Cromwell, while operating a vehicle, approached A.H. on Kensington Avenue and asked her to get into their car. N.T. 6/28/2016 at 147. A.H. was asked which drugs she used and upon informing the two that she used cocaine, she got into the car was transported to the Ramada Inn on Roosevelt Boulevard. *Id* at 148. The Appellant and Cromwell, after telling A.H. they had a place for her to stay, took her to a room filled with multiple girls where A.H. "realized what they had going on there" and the girls were "prostituting." *Id* at 150-51. A.H. then testified that the Appellant informed her that they would post online advertisements for A.H. so that she could exchange sexual intercourse with customers for money. *Id* at 159. A.H. then testified that she performed 10 to 15 "dates" per day exchanging money for sexual intercourse. *Id* at 168. A.H. further testified that if she did not feel like doing a "date" on a certain day, she could not refuse and knew there would be consequences for such a refusal. *Id* at 171. Therefore, the Appellant recruited A.H. for the purpose of prostitution and required her to perform sexual acts in exchange for money.

The trial court found that A.H. worked as a prostitute for the Appellant and his organization while under the age of 18. Forcing a child to work as a prostitute "would offend the common sense of the community and the sense of decency, propriety and morality, which most

31

people entertain." *Commonwealth v. Pankraz,* 554 A.2d 974, 977 (Pa. Super. 1989). The trial court found there was sufficient evidence that the Appellant did traffic the minor, A.H. Accordingly, there was sufficient evidence to conclude that exposure to such a lifestyle would tend to corrupt a minor. Therefore, there was sufficient evidence to convict the Appellant of Corruption of a Minor.

### h. Simple Assault

The Appellant next contends that the evidence was insufficient to sustain his conviction for simple assault. Pursuant to 18 Pa.C.S.A. § 2701, a person "is guilty of assault if he: (1) attempts to cause or intentionally, knowingly, or recklessly causes bodily injury to another." 18 Pa.C.S.A. § 2701(a). Bodily injury is defined as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301. A person acts intentionally with respect to a material element of an offense when "it is his conscious object to engage in conduct of that nature or to cause such a result." 18 Pa.C.S.A. § 302(b)(1)(i). As intent is a subjective frame of mind, it "is of necessity difficult of direct proof." *See Commonwealth v. Matthews,* 870 A.2d 924, 929 (Pa. 2005). Intent can be proven by "direct or circumstantial evidence; it may inferred from acts or conduct or from the attendant circumstances." *Id.*

Here, the evidence is more than sufficient to sustain the Appellant's conviction for Simple Assault. It was well within the province of the factfinder to conclude the Appellant intended to cause bodily injury to the victim. The victim, M.S., testified at length about the multiple times that she was beaten at the hands of the Appellant. M.S. testified that on one occasion, on her birthday, the Appellant found the victim after she had not returned to her room and took her into the bathroom and punch the "shit out of me in my rib or like whatever . . . Like, I got beat up." N.T. 06/28/2016 at 83-84. The victim testified at length about receiving "punches

32

to the ribs" called "ribshots," from the Appellant and received "ribshots" on the evening of her birthday. *Id.* M.S. then testified to another occasion after trying to leave the Appellant where she was beat up by "G" and it was extremely painful. *Id* at 91. In perhaps the most chilling episode, M.S. testified that she was attacked by the Appellant and three other persons in a room at the Roosevelt Inn in Philadelphia so severely that she suffered blows to the head, broken ribs, labored breathing, and severe bruising. *Id* at 92-94. The response by the Appellant and his cohorts was to supply M.S. with heroin and have her perform four "dates." *Id* at 95. Another victim, A.H., testified to being in a hotel room directly above M.S. and the Appellant and hearing through the floor M.S. scream as the Appellant assaulted her. *Id* at 174-75.

The Appellant testified in his own defense and stated during cross-examination that "I smacked [M.S.]," and that he smacked her a "couple of times" with an open hand and with enough force to give the victim a black eye. N.T. 06/29/2016 at 177-78, 180. There is little room for doubt that the Appellant intended to cause substantial pain to the victim through his action of striking M.S. in the face and upper torso. During closing argument, defense counsel stated to the simple assault charge that the defense had "no argument." *Id* at 219. The testimony of victims, the admission by the Appellant of assaulting M.S. and all other relevant factors lead to a conclusion that the evidence is beyond sufficient to prove beyond a reasonable doubt that the Appellant is guilty of simple assault.

### i. Trafficking of Persons

Next, the Appellant argues that the Commonwealth's evidence was insufficient to prove the elements of Counts Fifteen and Sixteen, Trafficking of Persons. The trial court first notes that the Appellant was convicted under the previous Pennsylvania human trafficking statute. The Appellant was convicted of two separate counts under this statute. The first conviction is a first

degree felony under § 3002(b) because one victim was under age 18. The second conviction is a

second degree felony because the victim was not a minor. The former 18 Pa.C.S.A. § 3002

defined trafficking of persons as:

> § 3002. Trafficking of persons.
>
> (a) Offense defined.-- A person commits an offense if the person
> knowingly traffics or knowingly attempts to traffic another person,
> knowing that the other person will be subjected to forced labor or
> services.
> (b) Grading.-- An offense under subsection (a) shall be graded a felony of
> the second degree unless the other person suffers bodily injury or the other
> person is an individual under 18 years of age, in which case it shall be
> graded as a felony of the first degree.

18 Pa.C.S.A. § 3002. Under this Section, traffic is defined as "recruits, entices, harbors,

transports or provides or obtains by any means." 18 Pa.C.S.A § 3001. Additionally, under this

Section, forced labor has been defined as:

> Labor or services that are performed or provided by another person which
> are obtained or maintained when a person:
>> (1) attempts to cause, causes or by threat of physical menace puts
>> another person in fear of bodily injury;
>> (2) physically restrains or threatens to physically restrain another
>> person unlawfully;
>> (3) abuses or threatens to abuse the law or legal process;
>> (4) possesses except as required by Federal immigration law or
>> regulation, destroys, conceals, removes or confiscates any actual or
>> purported passport or other immigration document of another
>> person, or any other actual or purported government identification
>> document of another person;
>> (5) engages in criminal coercion of another person.

18 Pa.C.S.A. § 3001. Therefore, for conviction, the Crimes Code requires the Commonwealth to

prove: (1) that the Appellant "did traffic or knowingly attempt to traffic another person;" and (2)

that the Appellant "knew that the other person would be subjected to forced labor or services."

The trial court first heard extensive testimony from an expert witness, Detective Derrick

Stigerts, a member of the FBI Crimes Against Children Task Force. The expert witness cast

considerable light upon the methods employed by traffickers to recruit and maintain control over vulnerable girls for the singular purpose of employing the victims as sex workers. Detective Stigerts stated that traffickers will recruit victims, and often minors, from "places where runaways are in an attempt to recruit them." N.T. 6/28/2016 at 31. The recruiting starts with the the traffickers "talking to the girls and trying to find out what the vulnerabilities are of the women and girls. And by vulnerabilities, I mean anything from they're runaways, they don't have a place to stay, to they don't have any family structure." *Id.* After the trafficker has identified the vulnerability, the trafficker "preys[s] on the vulnerabilities. They provide those things for the victim for the victims that they're actually recruiting." *Id.* The testimony from Detective Stigerts provided a frame of reference for the behavior that is commonplace among human traffickers and is conduct that matches that of the Appellant.

### 1. Minor Victim – A.H.

The Appellant contends that there was insufficient evidence presented by the Commonwealth at trial to sustain the conviction for Trafficking of Persons – Minor. The trial court disagrees. A thorough review of the record establishes that sufficient evidence was presented to meet the necessary thresholds to sustain the Appellant's conviction.

### a. Element One – Did Knowingly Traffic

The first element in trafficking of persons requires the Commonwealth to prove beyond a reasonable doubt that the defendant did knowingly or attempted to traffic another person. By definition, a person traffics another when a person recruits, entices, harbors or transports another. Here, the Appellant and Cromwell, while operating a vehicle, approached A.H. on Kensington Avenue and asked her to get into their car. N.T. 6/28/2016 at 147. A.H. was asked which drugs she used and upon informing the two that she used cocaine, she got into the car and was

transported to the Ramada Inn on Roosevelt Boulevard. *Id* at 148. The Appellant and Cromwell, after telling A.H. they had a place for her to stay, took her into a room filled with multiple girls where A.H. "realized what they had going on there" and the girls were "prostituting." *Id* at 150-51. Thus, the first element required for proving trafficking is sufficiently proven through the Appellant's recruitment and enticing of A.H. through offering her narcotics, offering her a place to stay knowing that she was homeless and would accept his offer. Likewise, the Appellant further trafficked A.H. because he transported A.H. initially to the Ramada Inn for the explicit purpose of A.H. becoming a prostitute.

The second instance in which the record sufficiently demonstrates the Appellant trafficked A.H. within the scope of this Section comes through his conduct after the discovery of her minor status. In that instance, the Appellant told A.H. to "pack up [her] stuff and [the Appellant] was going to let [A.H.] stay at his wife's house for a couple days." N.T. 06/28/2016 at 182. After a few days at the Appellant's home, A.H. was picked up from the residence and driven back to a hotel by both Cromwell and the Appellant. N.T. 06/28/2016 at 184. At that time, the Appellant did not tell A.H. to stop performing work as a prostitute. *Id* at 195. The Appellant did not attempt to contact A.H.'s parents or otherwise intervene. The only likely conclusion to be drawn from the Appellant transporting A.H. back to a hotel, after she had spent the several previous months living and working as a prostitute in hotels, is that A.H. would continue to support herself by means of prostitution for Cromwell and the Appellant. Therefore, the Appellant transported – and trafficked – A.H. from his home on Tackawanna Street in Philadelphia to a motel for the purpose of being subjected to forced labor.

### b. Element Two – Trafficked Knowing Other Person Would Be Subjected to Forced Labor

The second element in trafficking of persons requires the Commonwealth to prove beyond a reasonable doubt that the defendant trafficked the person knowing the other person would be subject to forced labor. Forced labor, in relevant part here, is defined as labor or services that are performed or provided by another person which are obtained or maintained when a person: (1) attempts to cause, causes or by threat of physical menace puts another person in fear of bodily injury. 18 Pa.C.S.A. § 3001. The trial court will first address A.H.'s fear of the Appellant and the result this had in her conduct and forced labor. As a secondary matter, given the Appellant was convicted of conspiracy to traffic persons, and his co-conspirator Elton Cromwell pled guilty to the charge, the trial court will address the second element within a frame of one conspirator's conduct in furtherance of the conspiracy being attributable to co-conspirators. Under either theory, there is sufficient evidence to prove beyond a reasonable doubt that the Appellant trafficked A.H. knowing she would be subject to forced labor.

Forced labor results when a person attempts to cause, causes or threatens physical harm to another person to obtain or maintain services from that other person. One of the hallmarks of forced labor under § 3002 is whether the fear of physical harm induces the service. The service she was forced to perform included sexual intercourse for money, also called "dates." A date is the actual act of prostitution between the customer and the prostitute. N.T. 6/28/2016 at 26. A.H. testified at trial that she was "afraid" of the Appellant because he was more intimidating than Cromwell or the others because "he was more violent towards the girls that worked for him." *Id* at 180. Under this logic, if A.H. did work for the Appellant, then he would not be violent towards her nor would she have reason to fear violence from the Appellant. A.H. stated that she saw the Appellant at the hotel "every day, every couple of days." *Id* at 173. During this time, A.H. testified that she was witness to the Appellant's acts of violence towards the other girls on

37

numerous occasions. *Id.* One such incident that A.H. heard was the beating of one victim, M.S., through the ceiling of her hotel room who was in the room directly above with the Appellant. A.H. heard screaming from M.S. and an elevated voice from the Appellant and later saw M.S. being helped walking to a car by several men. *Id* at 176. A.H. testified that she was the subject of violence at the hands of Elton Cromwell, an individual who worked as a "puppet" for the Appellant. N.T. 6/28/2016 at 180; N.T. 6/29/2016 at 19-20. A.H. further testified that if she did not feel like doing a "date" on a certain day, she could not refuse and knew there would be consequences for such a refusal. *Id* at 171. The fact A.H. could not refuse a "date" only further illustrates that she felt compelled, or forced, to perform labor within the meaning of the statute. Therefore, there was sufficient evidence presented at trial to prove that the Appellant personally, and as a co-conspirator, trafficked a minor person.

### 2. Adult Victim – M.S.

The Appellant next contends that there was insufficient evidence presented at trial to prove his guilt beyond a reasonable doubt for Trafficking of Persons. For reasons that follow, there was more than sufficient evidence presented to demonstrate that the Appellant did knowingly traffic a person and trafficked such person knowing the victim, M.S., would be subjected to forced labor.

### a. Element One – Did Knowingly Traffic

The first element in trafficking of persons requires the Commonwealth to prove beyond a reasonable doubt that the defendant did knowingly or attempted to traffic another person. By definition, a person traffics another when a person recruits, entices, harbors or transports another. Here, there was sufficient evidence presented at trial to demonstrate the Appellant did knowingly traffic the adult victim, M.S., within the meaning of the statute. The first method through which

38

he trafficked the adult victim, M.S., was through his enticement of controlled substances. M.S. testified that during a Greyhound bus trip from Pittsburgh to Philadelphia she encountered a girl named "Star" who told her that she should come with her because M.S.'s destination was unsafe, according to an assessment by Star. N.T. 6/28/2016 at 54-55. Star brought M.S. to a row-home in Philadelphia that was occupied by five or six other girls and the Appellant. *Id* at 56-57. M.S. flatly told The Appellant that she was addicted to crack cocaine. *Id* at 59. It was during this first encounter with the Appellant that he provided her free crack cocaine and offered her the opportunity to work for him doing "dates" and have a constant supply for controlled substances. *Id* at 57-59, 62. The Appellant recruited M.S. to provide sexual services through the internet, enticed her with the promise of drugs and harbored M.S. by paying for hotel rooms in which M.S. would stay during her employment with the Appellant. The Appellant preyed upon the vulnerability of a young woman's drug addiction for his financial interest and treated her accordingly.

The second manner in which the Appellant trafficked a person within the statutory meaning of the first element required for conviction is through the Appellant's passage of M.S. to his brother, Jason Guerra. Under this Section, trafficking of a person includes "providing" any person to another person for the purpose of forced labor. 18 Pa.C.S.A. § 3001. The victim, M.S., testified at trial that Jason Guerra was "having problems like where he was living and, like needed help, and that was the solution." N.T. 6/28/2016 at 89. M.S. testified that the Appellant essentially stated to his brother that Jason should "come up here [Philadelphia] and I'll show you how to do this and like, you can get some money." *Id*. M.S. further testified that her understanding of why she was going with Jason Guerra was simply to make money for Jason

39

Guerra. *Id.* The Appellant had every intention of teaching his brother, Jason, how to make money through prostituting vulnerable women, and his first victim was M.S.

### b. Element Two – Trafficked Knowing Other Person Would Be Subjected to Forced Labor

The second element the Commonwealth is required to prove to support a conviction for Trafficking of Persons is that a defendant trafficked a person knowing the other person would be subject to forced labor. Forced labor results when a person attempts to cause, causes or threatens physical harm to another person to obtain or maintain services from that other person. One of the hallmarks of forced labor under § 3002 is whether the fear of physical harm induces the service. 18 Pa.C.S.A. § 3001. At trial, there was more than sufficient evidence to conclude beyond a reasonable doubt that the Appellant trafficked victim M.S. with the knowledge that she would be subject to forced labor; with much of that forced labor originating from the Appellant himself.

The record is littered with instances in which M.S. was subject to forced labor. As an initial matter, the trial court is swayed by the testimony given by M.S. regarding the violence she endured at the hands of the Appellant. M.S. testified that she was the victim of a beating by four persons – led by the Appellant – that saw her suffer broken ribs. N.T. 6/28/2016 at 94. After asking members of the group to be brought to a hospital for medical attention, M.S. was informed she "had to do four dates before anything." *Id.* The victim, after having just been beaten by a group of four individuals, is forced to perform sexual services with four customers before being granted the ability to seek medical help. M.S. described another occasion during which she was chased through a hotel room by the Appellant wielding an extension cord and when caught she was forcibly anally raped by the Appellant. *Id* at 86-87. On yet another occasion, M.S. testified that after the Appellant found her in a hotel hallway, after not being able to locate her because she was hiding, began beating her in one hotel room and proceeded to a

40

second hotel room where she was beaten in that room's bathroom. *Id* at 81-83. There appears to be no shortage of conduct by the Appellant that would qualify as actual bodily injury required under the definition of forced labor.

However, the trial court also notes the inability of M.S. to freely leave the Appellant. M.S. testified directly that she did not think she could leave him. N.T. 6/28/2016 at 88. On one particular occasion, M.S. recounted how she had attempted to leave the Appellant and went to "another room . . . farther down on Roosevelt Boulevard . . . And like, he came and [the Appellant] came and got me and I got beat up." *Id* at 90. M.S. testified that she often received ribshots – punches to the upper torso area – from the Appellant to maintain compliance with his wishes. *Id* at 84. The reason that M.S. cites for these "ribshots" is that she "may or may not have like disappeared or like tried to leave and like go to another hotel or something." *Id*. M.S. was in constant fear that the Appellant would come and find her during the times she attempted to leave. *Id*. The trial court believes the fear M.S. experienced, along with her various failed efforts to leave, qualify as forced labor. Therefore, the evidence submitted at trial was more than sufficient to prove the required elements of Trafficking of Persons beyond a reasonable doubt.

### 3. Adult Victim – T.W.

The Appellant contends that there was insufficient evidence presented at trial to prove his guilt beyond a reasonable doubt for Trafficking of Persons. The trial court has addressed the sufficiency of the evidence for one adult victim, M.S. However, in an abundance of caution, the trial court will also address the Trafficking of Persons claim at it relates to a second adult victim that testified at trial, T.W. For reasons that follow, there was more than sufficient evidence presented to demonstrate that the Appellant did knowingly traffic T.W. and trafficked such person knowing the victim, T.W., would be subjected to forced labor.

41

### a. Element One – Did Knowingly Traffic

The first element in trafficking of persons requires the Commonwealth to prove beyond a reasonable doubt that the defendant did knowingly or attempted to traffic another person. By definition, a person traffics another when a person recruits, entices, harbors or transports another. Here, there was sufficient evidence presented at trial to demonstrate the Appellant did knowingly traffic the adult victim, T.W., within the meaning of the statute. T.W. testified that in June, 2008 she ran into Eddie Mendez at a Target in the City of Philadelphia, at which time Mendez invited T.W. to get into his car and visit a hotel with him. N.T. 6/29/2016 at 6-7. On the way to the hotel, Mendez stopped the car and picked up the Appellant who both traveled with T.W. to the Roosevelt Inn on the Roosevelt Boulevard. *Id* at 8. Upon entering the hotel room, T.W. saw other girls in the room and was almost immediately propositioned to begin prostituting. *Id.* the Appellant personally informed T.W. about the prices she was to charge for her services and that T.W. was to "check in with either [the Appellant] or Eddie" each time a customer arrived and left. *Id* at 10. The Appellant gave T.W. a phone to receive calls for sexual services – from Craigslist – and stated that the Appellant posted the advertisements on Craigslist for her. *Id* at 12, 14. T.W. further testified that the Appellant would pay for hotel rooms and stay in the hotel rooms with the victims. *Id* at 15.

The second method in which T.W. was trafficked was, similar to M.S., through her eventual transfer by the Appellant to work for Jason Guerra. T.W. testified that although she was not present for the conversation between the Appellant and Jason Guerra, some arrangement had been made at the hotel by the airport that provided for her transfer to Jason Guerra. *Id* at 23. This testimony is consistent with the version provided by M.S. during her testimony about M.S.'s own transfer to Jason Guerra. The instructions that T.W. received from Jason Guerra were duplicative

of those by the Appellant: that "the same rules that apply with [the Appellant] apply with me." *Id*

at 25. These rules would include how much to charge customers for sexual services, how to

handle money and the requirement to check in with Jason Guerra. Therefore, T.W., was

recruited, enticed and transferred within the meaning of "trafficked" to satisfy the first element

beyond a reasonable doubt.

### b. Element Two – Trafficked Knowing Other Person Would Be Subjected to Forced Labor

The second element the Commonwealth is required to prove to support a conviction for

Trafficking of Persons is that a defendant trafficked a person knowing the other person would be

subject to forced labor. Forced labor results when a person attempts to cause, causes or threatens

physical harm to another person to obtain or maintain services from that other person. One of the

hallmarks of forced labor under § 3002 is whether the fear of physical harm induces the service.

18 Pa.C.S.A. § 3001. At trial, there was more than sufficient evidence to conclude beyond a

reasonable doubt that the Appellant trafficked victim T.W. with the knowledge that she would be

subject to forced labor; with much of that forced labor originating from the Appellant himself.

T.W. testified that on one occasion, after she had gone to work for his brother, the

Appellant severely beat her. T.W. stated that she "had [the Appellant's] handprints bruised on

the side of my face. I still have a cracked rib to this day. [The Appellant] would punch on me,

slap me, whatever he felt like doing at the time." N.T. 6/29/2016 at 28. The Appellant had

slapped T.W. with such force that "he left his fingerprints bruised to the side of [her] face." *Id* at

30. T.W. testified that the Appellant assaulted her on another occasion when she tried to leave

working for him. *Id*. T.W. had bruises that were visible around her ribs, experienced painful

breathing and had a lump visible from these assaults. *Id* at 29. Perhaps most tellingly, T.W.

stated that she "wasn't allowed" to seek any medical treatment for these injuries. *Id*. T.W. further

testified that Mendez and the Appellant would not allow T.W. to take days off from working. *Id* at 19. T.W. also testified she was the victim of assaults from Mendez, a lower member of the Guerra organization. *Id* at 28. Summarily, T.W. stated that she stayed because "you either lose your life or stay. I'm not willing to lose my life." *Id* at 47. The Appellant indoctrinated into his victims an intense fear for the consequences of leaving or non-compliance through actual and physical harm. This fear and pattern of physical assaults more than meets the required definition of forced labor. Therefore, there is sufficient evidence in the record to demonstrate the Commonwealth proved the second element, that T.W. was trafficked knowing she would be subjected to forced labor, beyond a reasonable doubt.

### 4. Conclusion

Here, the Commonwealth was required to prove two elements beyond a reasonable doubt to secure a conviction for Trafficking of Persons: (1) that the defendant did knowingly traffic or attempted to traffic another person; and (2) that a defendant trafficked a person knowing the other person would be subject to forced labor. The Commonwealth brought two charges against the Appellant for Trafficking of Persons; the first for trafficking a minor and the other for trafficking an adult. More than sufficient evidence has been presented that the Appellant recruited the minor, A.H., and enticed her within the meaning of "knowingly traffic" required in the first element. The record also supports that the Appellant trafficked A.H. knowing that she would be subjected to forced labor. The Commonwealth also presented sufficient evidence that the Appellant trafficked both adults, M.S. and T.W., within the meaning of the statute. The Commonwealth also presented sufficient evidence that the Appellant trafficked both M.S. and T.W. knowing that both would be subject to forced labor. Therefore, the trial court believes that

44

sufficient evidence supports the convictions on both counts and that the Commonwealth proved all required elements beyond a reasonable doubt.

### j.  Unlawful Contact with a Minor – Sexual Abuse

The Appellant next contends that the evidence presented at trial is insufficient to sustain his conviction for Unlawful Contact with a Minor – Sexual Abuse in violation of 18 Pa.C.S.A. § 6318(a)(5). The offense of Unlawful Contact with a Minor is defined in the Crimes Code as:

> § 6318. Unlawful Contact with minor
> (a) Offense defined. A person commits an offense if he is intentionally in contact with a minor, or a law enforcement officer acting in the performance of his duties who has assumed the identity of a minor, for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth:
>
> ...
>
> (5) Sexual abuse of children as defined in section 6312 (relating to sexual abuse of children).

18 Pa.C.S.A. § 6318(a)(5). The grading under subsection (b) of § 6318 provides that a violation of subsection (a) is: (1) an offense of the same grade and degree as the most serious underlying offense in subsection (a) for which the defendant contacted the minor; or (2) a felony of the third degree. The underlying charge rises out of § 6312(c) – Sexual Abuse of Children through dissemination of photographs, videotapes, computer depictions and films. However, our Supreme Court has held that § 6318 does not require that a defendant be convicted of the substantive offense for which he contacted the minor, let alone be charged with it. *Commonwealth v. Reed*, 9 A.3d 1138, 1146 (Pa. 2010).

Although the Commonwealth need not prove the substantive offense, a brief discussion of the underlying offense remains useful. The underlying charge for the Appellant was sexual abuse of children under 18 Pa.C.S.A. § 6312(c). This subsection, in relevant part, states that:

> any person who knowingly sells, delivers, disseminates, transfers, displays, or exhibits to others, or who possesses for the purpose of sale, distribution, delivery,

45

transfer, display or exhibition any book, magazine, pamphlet, slide, photograph, film, videotape, computer depiction or other material depicting a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such act commits an offense.

18 Pa.C.S.A. § 6312(c). Under subsection (g) of Section 6312, a prohibited sexual act is defined as sexual intercourse as defined in section 3101, masturbation, sadism, masochism, bestiality, fellatio, cunnilingus, lewd exhibition of the genitals or nudity if such nudity is depicted for the purpose of sexual stimulation or gratification of any person who might view such depiction. 18 Pa.C.S.A. § 6312(g). Therefore, a conviction may result under § 6312(c) if a person knowingly disseminates, transfer or displays any photograph or computer depiction of a child under 18 years of age engaged in the lewd exhibition of the genitals or nudity if the nudity is depicted for the purpose of sexual stimulation of any person who might view such depiction.

The Appellant is charged with unlawful contact with a minor with sexual abuse of a child as the substantive charge. Under Section 6318, a person commits an offense if he is intentionally in contact with a minor for the purpose of engaging in the dissemination or transfer of any photograph or computer depiction of a person under 18 years of age engaged in the lewd exhibition of the genitals or nudity if the nudity is depicted for the purpose of sexual stimulation of any person who might view such depiction.

Here, the Appellant and a group of others, by way of their relationship to each other, agreed to commit a crime, and with shared intent, committed over acts in furtherance of the conspiracy to traffic a minor person, promote prostitution and, by the nature of their business, had unlawful with a minor. The Appellant may be held accountable under a theory of accomplice liability or as a co-conspirator.

46

There was sufficient evidence in the record to support the Appellant's conviction for

unlawful contact with a minor under a theory of accomplice liability or as a co-conspirator.

Regarding accomplice liability, the Crimes Code states:

> Liability for conduct of another; complicity
> (a) General rule.—A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.
> (b) Conduct of another.—A person is legally accountable for the conduct of another person when:
>> (1) acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct;
>> (2) he is made accountable for the conduct of such other person by this title or by the law defining the offense; or
>> (3) he is an accomplice of such other person in the commission of the offense.
> (c) Accomplice defined.—A person is an accomplice of another person in the commission of an offense if:
>> (1) with the intent of promoting or facilitating the commission of the offense, he:
>>> (i) solicits such other person to commit it; or
>>> (ii) aids or agrees or attempts to aid such other person in planning or committing it; or
>> (2) his conduct is expressly declared by law to establish his complicity.
> (d) Culpability of accomplice.—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

18 Pa.C.S.A. § 306. The evidence in this case, viewed in a light most favorable to the

Commonwealth as the verdict-winner, demonstrates the Appellant's active participation in the

contacting and recruitment of A.H., aiding and agreeing to aid Elton Cromwell in posting

advertisements of A.H. to solicit customers. The Appellant aided in the commission of the

offense through providing computers, transportation, and hotel rooms that permitted Cromwell to

commit the offense.

The Appellant is also liable as a co-conspirator. Accomplice liability and conspiracy are not one and the same crime. *Commonwealth v. McClendon*, 874 A.2d 1223, 1229 (Pa. Super. 2005). Conspiracy requires proof of an additional factor which accomplice liability does not: the existence of an agreement. *Commonwealth v. Murphy*, 795 A.2d 1025 (Pa. Super. 2002). To sustain a conviction for criminal conspiracy, the Commonwealth must establish that: (1) the defendant entered into an agreement to commit or aid in an unlawful act with another person or persons; (2) he did so with a shared criminal intent; and (3) an overt act was done in furtherance of the conspiracy. *Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa. Super. 2011). However, an "explicit or formal agreement to commit the crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Geiger*, 944 A.2d 85, 90 (Pa. Super. 2008). Circumstantial evidence may provide proof of the conspiracy. *Commonwealth v. Greene*, 702 A.2d 547, 554 (Pa. Super. 1997). The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy. *Id.*

Additionally, in respect to the overt act, it need "not be committed by the defendant; it need only be committed by a co-conspirator." *Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000). The intent required for criminal conspiracy is "identical to that required for accomplice liability. In both crimes a defendant must act with the intent of promoting or facilitating the offense." *Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa. Super. 2002).

The trial court will briefly revisit the existence of a conspiracy as it relates to this charge. At trial, the Appellant was emphatic in his assertion that the minor, A.H., did not work for him. He went through extreme lengths to distance himself from any activity that included A.H. However, the trial court "while passing upon the credibility of witnesses and the weight of the

48

evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Tejada*, 107 A.3d 788, 792-93 (Pa. Super. 2015). The trial court heard from the investigating officer of the Pennsylvania State Police that the "heads of corrupt organizations always attempt to insulate themselves from their underlings . . . because they don't want to be implicated as the ring leader." N.T. 6/29/2016 at 101. During his testimony after discovering A.H. was a minor, the Appellant stated that Cromwell "don't [sic] have no money" to get a hotel room for A.H. or do anything with her. *Id* at 194. A.H. testified that the Appellant always had one or two hotel rooms at any given time. N.T. 6/28/2016 at 164. Accordingly, the trial court found that the Appellant was responsible for providing the hotel room after discovering her minor status that allowed for the continued sexual abuse of a child and unlawful contact with a minor.

Regarding specific details of the transmission of the computer depictions of a minor there is little doubt that such images were posted. Through all the denials of his involvement with A.H., the trial court found salient one detail that the Appellant perhaps let slip during his testimony. Regarding A.H., the Appellant unequivocally states that "she used my computer." N.T. 6/29/2016 at 171. Trooper Peterson provided a forensic computer report at trial that documented the retrieval of the Craigslist advertisements for erotic services and pictures of A.H. used in the advertisements. *Id* at 62-64. There is no question that A.H. was under the age of 18 at the time these postings were made to Craigslist. *Id*. A.H. testified that one picture was taken, by Cromwell, at the Roosevelt Inn while she worked for Cromwell and the Appellant. N.T. 6/28/2016 at 191. The purpose of the pictures was to draw interest in A.H. from potential customers, therefore such pictures would have been "the lewd exhibition of the genitals or nudity if the nudity is depicted for the purpose of sexual stimulation of any person," as required under § 6312(c).

The "web of evidence" points to the existence of a conspiracy headed by the Appellant. There is a chain of money that goes: (1) from a customer to the victims after a sexual encounter in exchange for money; (2) from the victims to a driver or the person assigned to watch them; (3) from the drivers or persons assigned to watch the victims to the Appellant. N.T. 6/28/2016 at 204. There is a common thread in which the victims, in only the first of several methods of control, are supplied narcotics by the Appellant. M.S. testified that she witnessed the Appellant giving narcotics to Cromwell for distribution to the victims. *Id* at 75-75. A.H. testified that it was the Appellant's decision whether to continue to allow her working for the organization. There was testimony that the Appellant brought Cromwell, Eddie Mendez and Dwayne Thomas into the organization to help it expand. N.T. 6/28/2016 at 73. There exists in the record an explicit reference that one victim, M.S., heard an agreement being made between Cromwell and the Appellant regarding the criminal enterprise. *Id* at 124. Therefore, given the existence of a conspiracy, the Appellant is responsible for the acts of his co-conspirators that further the conspiracy. The unlawful contact with a minor charge is strongly supported with evidence throughout the record that supports the Appellant is responsible both as a member of the conspiracy and under accomplice liability. Therefore, there was sufficient evidence to support the Appellant's conviction for Unlawful Contact with a Minor – Sexual Abuse.

## II. Weight of the Evidence Claim – The verdicts were not against the weight of the evidence.

In his second principle point of appeal, the Appellant claims that the verdict was against the weight of the evidence. Pennsylvania Rule of Criminal Procedure 607 states that a "claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for new trial" in a written or oral motion before the court prior to sentencing, or in a post-sentence motion. Pa.R.Crim.P. 607(a)(1-3). The comment to Rule 607 establishes that the

"purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." Pa.R.Crim.P. 607, comment. The failure to challenge the weight of the evidence presented at trial in an oral or written motion prior to sentencing or in a post-sentence motion will result in the waiver of the claim. *Commonwealth v. Bond*, 985 A.2d 810, 820 (Pa. 2009). The Appellant filed a timely post-sentence motion and raised claims that verdicts were against the weight of the evidence. However, the Appellant in his post-sentence motion raised only claims that the verdicts for Trafficking of Persons (a Minor) and Corrupt Organizations were against the weight of the evidence. Therefore, pursuant to Pa.R.Crim.P. 607, the Appellant is deemed to have waived any weight of the evidence claims for the other remaining convictions.

In reviewing a weight of the evidence claim, the appellate court focuses solely on whether the trial court abused its discretion; it does not consider the underlying question of whether the verdict itself was against the weight of the evidence. *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). The essence of appellate review for a weight claim appears to lie in ensuring that the "trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion." *Commonwealth v. Clay*, 64 A.3d 1049, 1054- 55 (Pa. 2013). Because the trial judge "has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Johnson*, 910 A.2d 60 (Pa. 2006). Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. *Widmer*, 744 A.2d at 745.

51

A weight claim actually concedes sufficiency of the evidence, as the appellate court is to focus only on quality of the trial court's discretion. See *Widmer*, 744 A.2d at 751. Therefore, the "test is not whether the court would have decided the case in the same way, but whether the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail." *Commonwealth v. Whiteman*, 485 A.2d 459, 462 (Pa. 1984). The evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003). Accordingly, in order to reverse a trial court's ruling on a weight of the evidence claim, it "must determine that the verdict is so contrary to the evidence as to 'shock one's sense of justice.'" *Commonwealth v. Hitner*, 910 A.2d 721, 733 (Pa. Super. 2006).

### a. Trafficking of Persons (Minor)

The Appellant first contends that his conviction for Trafficking of Persons – Minor was against the weight of the evidence. However, there was ample support in the record to demonstrate that the Appellant was properly convicted of 18 Pa.C.S.A. § 3002 and does not shock one's sense of justice. The Appellant contended in his post-sentence motion that the evidence was "not of sufficient weight to convict for Trafficking of Persons (a Minor) since the minor testified that Petitioner was not her pimp and did not engage in any trafficking or profiteering from said minor." Def. Post-Sent'g Mot. 4. The Appellant appears to conflate the standard of review for weight of the evidence claims with that of sufficiency of the evidence. The trial court previously addressed the sufficiency of the evidence for the Appellant's Trafficking of Persons (Minor) conviction. However, in the interest of justice, the trial court will address the weight of the evidence claim as it relates to the Trafficking of Persons (Minor) conviction. Given that weight of the evidence claims are reviewed under an abuse of discretion

standard, the trial court does not believe that it abused its discretion in finding there was ample support in the record to support the Appellant's conviction under 18 Pa.C.S.A. § 3002.

Under the Trafficking of Persons statute, the Commonwealth must prove: (1) that the Appellant "did traffic or knowingly attempt to traffic another person;" and (2) that he "knew that the other person would be subjected to forced labor or services." The record supports that the Appellant did knowingly traffic another person. Traffic is defined as "recruits, entices, harbors, transports or provides or obtains by any means." 18 Pa.C.S.A § 3001. The Appellant and Cromwell, while operating a vehicle, approached A.H. on Kensington Avenue and asked her to get into their car. N.T. 6/28/2016 at 147. A.H. was asked which drugs she used and upon informing the two that she used cocaine, she got into the car was transported to the Ramada Inn on Roosevelt Boulevard. *Id* at 148. The Appellant and Cromwell, after telling A.H. they had a place for her to stay, took her into a room filled with multiple girls where A.H. "realized what they had going on there" and the girls were "prostituting." *Id* at 150-51.

The second instance in which the Appellant "trafficked" A.H. is through his transportation of A.H. from his home, after her true age was discovered, back to the hotel to continue engaging in acts of prostitution. After finding out that she was a minor, the Appellant told A.H. to "pack up [her] stuff and [the Appellant] was going to let [A.H.] stay at his wife's house for a couple days." N.T. 06/28/2016 at 182. After a few days at the Appellant's home, A.H. was picked up from the residence and driven back to a hotel by both Cromwell and the Appellant. N.T. 06/28/2016 at 184. At that time, the Appellant did not tell A.H. to stop performing work as a prostitute. *Id* at 195. There was direct testimony from witness T.W. that after the Appellant brought her back to the hotel that she continued working as a prostitute for the organization lead by the Appellant. N.T. 6/29/2016 at 22. Thus, the first element required

53

for proving trafficking is sufficiently through the Appellant's recruitment and enticing of A.H. through offering her narcotics, offering her a place to stay knowing that she was homeless and would accept his offer.

The second element requires the Commonwealth to demonstrate that the Appellant knew the person would be subject to forced labor. Forced labor is defined as services that are performed or provided by another person which are obtained or maintained when a person: (1) attempts to cause, causes or by threat of physical menace puts another person in fear of bodily injury. 18 Pa.C.S.A. § 3001. A.H. testified at trial that she was "afraid" of the Appellant because he was more intimidating than Cromwell or the others because "he was more violent towards the girls that worked for him." N.T. 6/28/2016 at 180. The Appellant was found to be the leader of the prostitution organization that included Eddie Mendez, Dwayne Thomas and Elton Cromwell. Even if the Appellant himself did not commit acts of violence upon A.H., the statute only requires that the Appellant have trafficked the minor knowing that she would be subject to forced labor. A.H. never received money back from the sexual services she provided. *Id* at 166. A.H. was the victim of violence at the hands of Cromwell. *Id* at 171-72. A.H. further testified that if she did not feel like doing a "date" on a certain day, she could not refuse and knew there would be consequences for such a refusal. *Id* at 171. The second requiring that the Appellant have knowledge A.H. would be subjected to forced labor is satisfied because the Appellant, as head of the organization, knew the methods employed by those working for him to gain compliance by victims through force and engaged in such conduct himself.

Here, the trial court heard extensive testimony about how the Appellant recruited, enticed and transported girls. This meets the first requirement that the Appellant traffic the victim. The trial court then heard testimony about how the Appellant ran his organization through both

54

threats of violence and acts of violence. A.H. was frightened of the Appellant, and was subjected to forced labor at the Appellant's hands and the acts of others in the organization. There are numerous instances in the record which support both the Appellant trafficking the minor and trafficking her with knowledge that she would be subject to forced labor. Despite the Appellant's assertion in his post-trial motion, there is no requirement that the Commonwealth present evidence of profits for conviction under the statute. Because there is ample support in the record to support the conviction, the verdict does not "shock one's sense of justice." Therefore, the trial court did not abuse its discretion in finding that the verdict was not against the weight of the evidence.

**b. Corrupt Organizations**

The Appellant next contends that his conviction for Corrupt Organizations was against the weight of the evidence. However, there was ample support in the record presented to demonstrate that the Appellant was properly convicted of section 911(b)(1) of the Corrupt Organizations Act and his conviction does not "shock one's sense of justice." In his post-sentence motion, the Appellant argues his conviction for Corrupt Organizations was against the "weight of the evidence because there were no details of necessary conspiracy, profits, and so forth necessary to establish such a conviction." Def. Post-Sent'g Mot. 4. For reasons that follow, the Appellant's conviction for Corrupt Organizations was not against the weight of the evidence.

As an initial matter, the Appellant claims in his post-sentence motion that his conviction for Corrupt Organizations was against the weight of the evidence because there were no details of a necessary conspiracy. After close reading of the subsection under which the Appellant was convicted, 18 Pa.C.S.A. § 911(b)(1), the trial court does not believe the Commonwealth was required to prove a conspiracy as an element for conviction under 911(b)(1). Rather, the Corrupt

55

Organizations Act lists the conspiracy to commit any offense set forth in subparagraphs (i), (ii), and (v) of § 911(h) as "racketeering activity" within the meaning of the Corrupt Organizations Act. 18 Pa.C.S.A. § 911(h)(1)(iii). Thus, conspiracy is only one possible offense that may be considered in determining whether a defendant engaged in "racketeering activity." This alone does not make it an element of the crime. The Corrupt Organizations Act, in one element of the crime, requires the finding beyond a reasonable doubt that a defendant engaged in a "pattern of racketeering activity." As discussed at length previously, a "pattern of racketeering activity" is two or more offenses laid out in § 911(h)(1). The two offenses under § 911(h)(1) through which the trial court found the Appellant to have engaged in a "pattern of racketeering activity" are the trafficking of persons (§ 911(h)(1)(i)) and the possession with intent to distribute a controlled substance (§ 911(h)(1)(ii)). Therefore, despite the Appellant having been convicted of conspiracy, the Commonwealth was not required to prove the existence of a conspiracy for the Corrupt Organizations charge.

The trial court disagrees with the Appellant that there was no discussion of profits throughout his trial. Again recalling that one of the underlying "racketeering activities" is the trafficking of persons, here, the trial court will solely explore the trafficking of persons above the age of 18 (despite the Appellant having been convicted of trafficking both adults and a minor). There was a network of victims that the Appellant trafficked and forced into labor. The trial court heard testimony that there were perhaps as many as eight victims working for the Appellant. N.T. 6/29/2016 at 215. The trial court heard testimony from two victims, that were adults at the time they were trafficked by the Appellant, that stated they each earned upwards of $1,000 per day from performing dates. N.T. 6/28/2016 at 69; N.T. 6/29/2016 at 19. The victims also unequivocally stated that they attempted to leave multiple times, were found and brought

56

back after physical assaults by the Appellant. N.T. 6/28/2016 at 96; N.T. 6/29/2016 at 28. Detective Derrick Stigerts, the Commonwealth expert, testified that trafficking victims never keep the money earned from their services. N.T. 6/282016 at 37.

The other avenue through which the Appellant drew a profit was from his distribution of narcotics. The Appellant stated that around the time of the charged events he sold both crack cocaine and heroin. N.T. 06/29/2018 at 184. The Appellant admitted that he "started picking [narcotics] up in large quantities so that it would be cheaper." *Id.* The Appellant then testified he would purchase approximately $500 worth of heroin at a time, break it down and sell to the girls and make a profit. *Id* at 185-86. The Appellant also testified that he would purchase approximately $100 of crack cocaine for distribution amongst the girls he had in his employ. *Id* at 186. However, there is a contradiction in the Appellant's testimony because he later testified that he sold M.S. $500, and not the $100 amount previously stated, worth of crack cocaine per day. *Id* at 191. The trial court believes that the Appellant's own admission to making a profit through the "racketeering activity" of distributing a controlled substance negates any inference that profits were never discussed during the trial.

Last, the trial court heard testimony from an expert witness about the structure of such organizations. The Commonwealth's expert witness, Detective Stigerts, explained that traffickers command obedience through force and that there is a family structure within the organization. N.T. 6/28/2016 at 31, 38. The trial court heard testimony from the investigating officer that the Appellant was the principal of the organization involving Elton Cromwell, Eddie Mendez and Dwayne Thomas. N.T. 6/292016 at 101-103. The trial court heard testimony from victims that Mendez, Thomas and Cromwell, all members of the organization, took orders from the Appellant. N.T. 6/28/2016 at 71, 196; N.T. 6/29/2016 at 56. There was testimony that these

57

members of the organization would collect the money from the victims. N.T. 6/28/2016 at 79-80. There was also extensive testimony that members of the organization, and the conspiracy, were receiving narcotics from the Appellant for distribution and "all the money is filtering back in." *Id* at 73. This testimony indicates that there was an "enterprise" as required within the statute.

Here, the trial court heard extensive testimony how: (1) the Appellant received income from a "pattern of racketeering activity; (2) the existence of an "enterprise" within the meaning of the Corrupt Organizations Act; and (3) the Appellant used the income received from the "pattern of racketeering" in the establishment or operation of the enterprise. The trial court's decision had more than sufficient support within the record. The evidence presented at trial, and the Appellant's conviction for Corrupt Organizations, does not shock one's sense of justice. Therefore, the trial court did not err in finding the verdict was not against the weight of the evidence.

### III. Unreasonable Sentence Claim – The trial court did not err in denying the Appellant's Motion to Reconsider Sentence and gave a reasonable sentence.

The Appellant was found guilty on eleven counts and sentenced to a total term of 37 to 74 years confinement. For his conviction of Possession of with Intent to Deliver (35 Pa.C.S.A. § 780-113(a)(30)), the Appellant was sentenced to one to two years confinement. For his conviction on Corrupt Organization (18 Pa.C.S.A. § 911(b)(1)), a felony of the first degree, the Appellant was sentenced to three years and six months to seven years confinement. For his conviction of Criminal Conspiracy (18 Pa.C.S.A. § 903), a felony of the first degree, the Appellant was sentenced to nine years to eighteen years confinement. For his conviction of Sexual Exploitation of Children (18 Pa.C.S.A. § 6320), a felony of the second degree, the Appellant was sentenced to five years to ten years incarceration. For his conviction of Criminal Use of a Communication Facility (18 Pa.C.S.A. § 7512(a)), a felony of the third degree, the

58

Appellant was sentenced one year to two years confinement. For his conviction of Promoting Prostitution (18 Pa.C.S.A. § 5902(b)(1)), a felony of the third degree, the Appellant was sentenced to one year and six months to three years confinement. For his conviction of Corruption of Minors (18 Pa.C.S.A. § 6301(a)(1)(i)), a misdemeanor of the first degree, the Appellant was sentenced to one year to two years confinement. For his conviction of Simple Assault (18 Pa.C.S.A. § 2701(a)), a misdemeanor of the second degree, the Appellant received a sentence of one to two years confinement. For his conviction on Trafficking of Persons – Minor (18 Pa.C.S.A. §3002), a felony of the first degree, the Appellant was sentenced to nine years and six months to nineteen years confinement. For his conviction of Trafficking of Persons (18 Pa.C.S.A. § 3002), a felony of the second degree, the Appellant received a sentence of five to ten years confinement. For his conviction of Unlawful Contact with a Minor (18 Pa.C.S.A. § 6318(a)(5)), a felony of the third degree, the Appellant was sentenced to a term of two years and six months to 5 years confinement. The sentencing court ordered all sentences run consecutively with the exception of the PWID sentence; Simple Assault sentence; Corruption of Minors sentence; and Criminal Use of a Communication Facility sentence, which were all to run concurrently with the first degree felony Trafficking of Persons – Minor (9.5 to 18 years) sentence.

Through the Sentencing Code, the General Assembly enacted the process by which defendants are to be sentenced. In making a determination of the appropriate sentence for a defendant, the Sentencing Code offers general standards which require the trial court to impose a sentence that is "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42. Pa.C.S. § 9721(b). The appellate court shall vacate the sentence and

remand the case to the sentencing court with instructions if it finds: "the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable. In all other cases the appellate court shall affirm the sentence imposed by the sentencing court." *Commonwealth v. Walls*, 926 A.2d 957, 963 (Pa. Super. 2007). The sentencing court "is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Jones*, 613 A.2d 1242, 1243 (Pa. 1990). The sentencing court enjoys an institutional advantage to appellate review "bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed." *See Walls*, 926 A.2d at 961.

In reviewing Appellant's sentencing claim, this court has determined that the sentence was sound, reasonable, and within the proper legal discretion of the court. In making an inquiry into the "unreasonableness" of a sentence, the General Assembly has set forth factors that an appellate court is to consider: (1) The nature and circumstances of the offense and the history and characteristics of the defendants; (2) the opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) the findings upon which the sentence was based; and (4) the guidelines promulgated by the commission. *Commonwealth v. Walls*, 926 A.2d 957, 963 (Pa. Super. 2007). When reviewing these factors, the court will not be found to have abused its discretion unless the record can show the judgment imposed was "manifestly unreasonable" or the result of prejudice, bias, or ill-will. *Commonwealth v. Hermanson*, 674 A.2d 281 (Pa. 1996).

Also, in evaluating a claim of this type, an appellate court must remember that the sentencing guidelines are merely advisory, and the sentencing court may sentence a defendant outside of the guidelines so long as it places its reasons for the deviation on the record. *See*

60

*Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa. Super. 2002). Our Supreme Court has

indicated that "if the sentencing court proffers reasons indicating that its decision to depart from

the guidelines is not unreasonable, we must affirm a sentence that falls outside those

guidelines." *Commonwealth v. Davis*, 737 A.2d 792, 798 (Pa. Super. 1999). The sentencing court

"is not required to parrot the words of the Sentencing Code, stating every factor that must be

considered under Section 9721(b)." *Commonwealth v. Feucht*, 955 A.2d 377, 383 (Pa. Super.

2008). Here, the sentencing court stated on the record the reasons for its departure from the

guidelines. The sentencing court noted how the Appellant preyed upon, and essentially held

captive, the most vulnerable in our society. The sentencing court also stated:

> Before I sentence you, I want to put on the record, as the law requires me to do,
> why I'm going to impose upon you an aggravated sentence . . . I find you have
> been the head of that organization, which ran over several years . . . where you
> preyed upon what I would call "damaged young women" who had drug
> addictions, who were runaways . . . The fact that one victim was actually a minor
> just aggravates the circumstances even more, but the women I heard testify, you
> could hear the pain in their voice, and they will never be the same again . . . Your
> prior record, the fact I find you to be a danger to the community, the fact you fled
> and was a fugitive for four years. When I look at this case, I find absolutely
> nothing to mitigate, but everything to aggravate your sentence that I'm going to
> impose upon you.

N.T. 5/4/2017 at 28-29. The sentencing court stated specifically on the record its reasons for

aggravating the Appellant's sentence. Additionally, with respect to consecutive versus

concurrent sentences, long standing precedent of our appellate courts recognizes that 42

Pa.C.S.A. § 9271 "affords the sentencing court discretion to impose its sentence concurrently or

consecutively to other sentences being imposed at the same time or to sentences already

imposed." *See Commonwealth v. Gonzalez-Dejusus*, 994 A.2d 595, 598 (Pa. Super. 2010). It

should also be noted that the defendant is not entitled to a "volume discount" for his or her

crimes. *See Commonwealth v. Hoag*, 665 A.2d 1212, 1215 (Pa. Super. 1995). Therefore, with

sufficient reasons for departure from the guidelines placed on the record, the sentencing court did not abuse its discretion in its departure from the guidelines or imposition of consecutive sentences for the Appellant.

The Appellant contends that the sentencing court erred in failing to address the norms of sentencing, deviates from the guidelines, imposes multiple statutory maximum sentences, and is an effective life sentence without proper justification on the record. More specifically, in his post-sentence motion, the Appellant states the sentencing court did not justify its sentence because a lower/guideline sentence or concurrent sentence would protect the public and would serve the Appellant's needs. The Appellant presented at sentencing with a prior record score of 5; the Appellant had prior convictions for felony possession of crack cocaine; hindering apprehension or prosecution; felony drug possession (cocaine); unlawful possession of a handgun; and a prostitution charge. In the instant case, given the plethora of charges of which the Appellant was convicted, and the offense gravity scores of those offenses which ranged from 4 (Corruption of a Minor) through 12 (Trafficking of Persons – Minor and Criminal Conspiracy to Traffic Persons – Minor), the sentences imposed by this court were reasonable.

The sentencing court disagrees with the defense contention that the court did not address the norms of sentencing. The court specifically stated that the sentences requested by the Commonwealth were "well beyond even the aggravated range of the guidelines. So, I want you to give me some clarity on why you think the guidelines call for almost ten years, you asked for twenty on some of these charges." N.T. 5/04/2017 at 14. The sentencing court stated on the record an acknowledgement of the sentencing norms through the guidelines and requested further statements from the Commonwealth on why the sentences should be aggravated.

62

A sentencing court has broad latitude to inquire into the personal character and circumstances of the defendant. *Commonwealth v. Riggins*, 453 A.2d 140 (Pa. 1977). In particular, a sentencing court may properly consider a defendant's potential for rehabilitation. *Commonwealth v. Kostka*, 379 A.2d 884 (Pa. 1977). One factor in gauging a defendant's potential for rehabilitation is his or her manifestation of social conscience and responsibility through contrition, repentance and cooperation with law enforcement agencies. *Roberts v. United States*, 445 U.S. 552 (1980); *Commonwealth v. Gallagher*, 442 A.2d 820 (Pa. 1982). The sentencing court found the Appellant lacked personal characteristics that would make him suitable for rehabilitation. For instance, the court was forced to admonish the Appellant for laughing during the testimony of one Commonwealth witness. The trial court had to interrupt testimony and state "Counsel, I would direct your client not to laugh during the course of testimony." N.T. 6/28/2016 104. The simple fact that the Appellant found anything elicited during testimony as humorous resonates as nothing short of chilling.

Speaking to the sentencing court's needs to protect the public, the sentencing court does not believe a lower or guideline sentence or concurrent sentences would sufficiently protect the public. One reason the Appellant fails to make a suitable candidate for rehabilitation and remains a threat to community safety is due to his flight from justice after becoming aware of the charges stemming from this case. The Appellant alleges that he became aware of these charges at some point during 2012. N.T. 6/29/2016 at 204. After he became aware of these charges, the Appellant actively avoided the police and moved throughout different jurisdictions including Philadelphia, New York City and New Jersey. *Id* at 205. The Appellant then admits, upon his return to Philadelphia, in order to support himself he "sold drugs" and once again worked as a pimp. *Id* at 206. Here, the court was presented with a defendant who became a fugitive from justice for four

years, moved throughout multiple jurisdictions·and then engages in the same conduct that produced these charges. The sentencing court reasonably believed that the Appellant was beyond rehabilitation and posed a continued threat to community safety.

One of the enumerated factors in § 9721(b) to be considered during sentencing is "the gravity of the offense as it relates to the impact on the life of the victim and on the community." 42. Pa.C.S. § 9721(b). The sentencing court heard extensive testimony about the impact of the offense as it relates to the impact on the victims and on the community. Perhaps the most notable aspect of the Appellant's offenses is his predation upon those who are most vulnerable within our community. The sentencing court was afforded a presentence report and also underwent an evaluation to consider whether the Appellant was a Sexually Violent Predator ("SVP"). When a sentencing judge had the benefit of a presentence report, it will be presumed that he was aware of relevant information regarding defendant's character and weighed those considerations along with mitigating statutory factors. *See Commonwealth v. Widmer*, 667 A.2d 215 (Pa. Super. 1995). Although the SVP analysis did not conclude the Appellant qualified as a sexually violent predator, it did reinforce the extreme level of dangerousness that the Appellant posed. This is reflected in two ways: first, through the manner in which he treated his victims; and second, how he exploited victims and the risk to the community through these methods.

The sentencing court would be remiss if it did not at least consider the nature of the offense itself. Although not the only factor considered in crafting his sentence, the egregious nature of the conduct also reflects upon the Appellant's potential for rehabilitation. The Appellant preyed upon, what the court at sentencing described as, "damaged young women, who had drug addictions, who were runaways, [and] lured them into what they believed was . . . somebody was trying to help them." N.T. 5/4/2017 at 29. The Appellant "locked them in hotel

64

rooms, fed them drugs, had lines out the door for men to come in and have sex with them. They were not allowed to leave. They were threatened that if they left, that you were going to inflict bodily injury upon them." *Id.* The Appellant had full knowledge that many of the victims had substance abuse problems and exploited this knowledge through limiting their access and supply to narcotics. The victims did not feel safe during their time under the Appellant and were exposed to physical assaults and rape. The sentencing court found that "the abuse [the Appellant] inflicted upon these women was just beyond [] imagination." *Id* at 28. The sentencing court determined that the Appellant forever changed the lives of his victims and posed a continuing threat to society at large. *Id* at 29.

Therefore, there is sufficient evidence in the record to support that the sentencing court provided an individualized sentencing that took into account the rehabilitative needs of the defendant. Accordingly, the sentence imposed was fair, impartial, and absent of any bias. This judgment was made in accordance with the applicable guidelines and with careful consideration of all the factors to be considered under Pennsylvania law.

## IV.  Witness Testimony – The trial court properly admitted evidence from the investigating officer that was rationally based upon his perception.

The Appellant next asserts the trial court erred in permitting the investigating officer to testify to his opinion that the Appellant was the head of a corrupt organization and thereby deprived the Appellant of a fair trial. The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. *See Commonwealth v. Tyson*, 119 A.3d 353, 357 (Pa. Super. 2015). Accordingly, a ruling admitting evidence "will not be disturbed on appeal unless that ruling reflects manifest

65

unreasonableness, or partiality, bias, or ill-will, or such lack of support to be clearly erroneous."

*Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa. Super. 2013).

Relevance is the threshold for admissibility of evidence. *Commonwealth v. Cook*, 952

A.2d 594, 612 (Pa. 2008). Evidence is considered relevant if: (a) it has any tendency to make a

fact more or less probable than it would be without the evidence; and (b) the fact is of

consequence in determining the action. Pa.R.E. 401; *Commonwealth v. Drumheller*, 808 A.2d

893, 904 (Pa. 2002). The Pennsylvania Rules of Evidence state that any evidence that is not

relevant is not admissible. Pa.R.E. 402. In addition, the court may exclude relevant evidence if

its "probative value is outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." Pa.R.E. 403.

Pennsylvania Rule of Evidence 701 addresses the admission of opinion testimony by lay

witnesses and provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is
> limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to
>     determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge
>     within the scope of Rule 702.

Pa.R.E. 701. Generally, lay witnesses may express personal opinions related to their observations

on a range of subject areas based on their personal experiences that are helpful to the factfinder.

*See Commonwealth v. Davies*, 811 A.2d 600, 602 (Pa. Super. 2002). Further, pursuant to

Pennsylvania Rule of Evidence 104(a), the trial court exercises its discretion to determine

whether such a lay opinion is helpful to the factfinder, which is the touchstone of its

admissibility. *See* Pa.R.E. 104(a); *Lewis v. Mellor*, 393 A.2d 941, 948-49 (Pa. Super. 1978).

Lay witnesses are permitted to give testimony in the form of their opinions or inferences that are rationally based on their perception. For example, in *Commonwealth v. Blessitt*, 852 A.2d 1215 (Pa. Super. 2004), a Pennsylvania State Police trooper performed an undercover drug purchase from a defendant and handed the defendant a marked twenty-dollar bill. The undercover trooper radioed ahead to a marked patrol vehicle which subsequently stopped the defendant and, upon arrival on the scene, the undercover trooper was not able to locate the marked bill used in the transaction. On cross-examination, defense counsel raised questions about whether suspects always have the marked bill on their person at the time of arrest. On redirect examination, the prosecutor asked the trooper his opinion as to what happened to the marked $20 bill, to which the trooper offered that it was probably handed off to another individual. The Superior Court found the trial court had not abused its discretion in permitting the admission of this testimony because the trooper's testimony was limited to expressing an opinion that was rationally based upon his perception. *See Blessitt*, 852 A.2d at 1218.

Here, the trial court did not abuse its discretion in permitting the investigating officer to testify to his opinion that the Appellant was the head of a corrupt organization. The Commonwealth stated that the trooper was "not being offered as an expert." N.T. 06/29/2016 at 99. Similar to the officer in *Blessitt*, Trooper Peterson expressed only an opinion that was rationally based on his perception. Having investigated this case for "years," the trooper was uniquely qualified to offer his rational perception about the case. *Id* at 68. Trooper Peterson's testimony about the Appellant's position within the organization did not prejudice the Appellant. Under Rule 401, the evidence being offered – whether the Appellant was the head of the conspiracy – offered the tendency to make the fact more or less probable and the fact is of consequence in determining the action. Under the Rule 403 balancing test, the trial court does

not believe unfair prejudice to the Appellant outweighed the probative value of the relevant evidence.

Courts are not required to sanitize the trial to eliminate all unpleasant facts from a fact-finder's consideration when those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. *See Commonwealth v. Antidormi*, 84 A.3d 736 (Pa. Super. 2014). Rather, the testimony of Trooper Peterson shed light upon the history and natural development of the events and offenses for which the Appellant was charged – trafficking of persons, conspiracy, sexual exploitation of children and corrupt organizations among several others. Therefore, the trial court properly admitted the testimony of Trooper Peterson in giving his opinion that was rationally based upon his perception.

### V. Witness Testimony – The trial court properly admitted evidence involving an alleged threat Elton Cromwell because a connective link to the Appellant was established.

The Appellant next asserts the trial court erred in allowing testimony elicited by the Commonwealth involving an alleged threat by Elton Cromwell against a witness testifying against the Appellant without establishing any connective link to the Appellant. The standard of review relative to the admission of evidence is for an abuse of discretion. *Commonwealth v. Cain*, 29 A.3d 3 (Pa. Super. 2011). For reasons that follow, the trial court did not err in allowing testimony involving an alleged threat by Elton Cromwell against a witness.

Pennsylvania Rule of Evidence 801(c) defines hearsay as a statement, other than one made by a declarant while testifying at a trial or hearing, offered to prove the matter asserted in the statement. Statement is further defined by this Rule as either an oral or written assertion. Pa.R.E. 801(a). Thus, a statement is hearsay when it is a "statement, other than one made by the

declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." *See Commonwealth v. Gray*, 867 A.2d 560 (Pa. Super. 2005). However, statements which are not admitted for the truth of the matter asserted, but for some other purpose, do not qualify as hearsay and are freely admissible. *Commonwealth v. Cassidy*, 462 A.2d 270, 272 (Pa. Super. 1983). The admission of extrajudicial statements to demonstrate the existence of a conspiracy is one such non-hearsay purpose. *See Cassidy*, 462 A.2d at 272.

There are also several exceptions to the hearsay rule. For instance, Pa.R.E. 803(25)(e) permits the use of statements of co-conspirators which were made during the course of the conspiracy as an admission of that party. Because Pa.R.E. 803(25)(e) is based upon the principles of agency, a statement of one co-conspirator is considered as an admission made by all conspirators. *See Commonwealth v. Johnson*, 838 A.2d 663, 675 (Pa. 2003). The Pennsylvania Superior Court has articulated the requisite standard for admitting a co-conspirator's hearsay statement as follows:

> To lay a foundation for the co-conspirator exception to the hearsay rule, the Commonwealth must prove that: (1) a conspiracy existed between declarant and the person against whom the evidence is offered and (2) the statement sought to be admitted was made during the course of the conspiracy. In addition, there must be evidence other than the statement of the co-conspirator to prove that a conspiracy existed. *Commonwealth v. Basile*, 458 A.2d 587 (1983).

> The order of proof is within the discretion of the lower court, which may, upon only slight evidence of the conspiracy, admit such statements subject to later proof of the conspiracy. *Commonwealth v. Plusquellic*, 449 A.2d 47 (Pa. Super. 1982).

*Commonwealth v. Kersten*, 482 A.2d 600, 603 (Pa. Super. 1984). The trial court need only slight evidence of a conspiracy's existence for such testimony to become admissible. Given the extensive prior discussion finding a conspiracy existed between the Appellant and Elton

69

Cromwell, the only question factor remaining which permits the admission of such testimony is whether the statement was made during the course of the conspiracy.

Our Supreme Court affirmed its approval of the use of evidence of a co-conspirator's attempt to conceal evidence after the commission of a crime, finding that such acts "c[a]me within the scope of the conspiracy to commit the crime." *Commonwealth v. Evans*, 413 A.2d 1025, 1028 (Pa. 1980). In doing so, the *Evans* court directed the following test be followed:

> The duration of a conspiracy depends upon the facts of the particular case, that is, it depends upon the scope of the agreement entered into by its members. Generally, the conspiracy ends when its principal objective is accomplished because no agreement to retain secrecy after the achievement of the unlawful end can be shown or implied by mere "acts of covering up." Thus in *Grunewald v. United States*, 353 U.S. 391 at 402, the Supreme Court stated, "Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." But the fact that the "central objective" of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such agreement may reasonably be inferred, the conspiracy may be found to continue. *Atkins v. United States*, 307 F.2d 937, 940 (9th Cir. 1962).

*Evans*, 412 A.2d at 1028-29. The duration of the conspiracy, and whether the conspiracy endured at the time statements were made depend upon the specific facts of the case. Other statutory factors that may be considered in weighing the duration of the conspiracy include whether the crime or crimes which are its object are committed or there is abandonment by the conspirators. 18 Pa.C.S.A. § 903(g).

Presently, the testimony in dispute arises from answers given by witness A.H. about threats made Elton Cromwell. A.H. states that Cromwell attempted to contact her through her parents. N.T. 6/28/2016 at 207. A.H. further testified that Cromwell showed up to her parents' home located in Bucks County. *Id* at 145, 207. A.H. was not present at her parents' home when

70

Cromwell attempted to visit, but A.H. testified that she was "scared" when she found out Cromwell had showed up at parents' home and that she did not "know why he would do that." *Id* at 207. Mr. Cromwell had never previously spoken with A.H.'s parents. *Id* at 208. A.H. also further testified that Cromwell had a cellular phone while jailed in Baltimore, Maryland and would call her cell phone from his cell phone while in jail. *Id.*

Here, the Appellant made several statements that could impute the conspiracy still existed with Cromwell even after the Appellant was arrested. He was charged in the present case in 2010. The Appellant testified that he became aware of the charges from this case sometime in 2012. N.T. 6/29/2016 at 204. However, the Appellant admitted that after he became aware of the charges, the Appellant still had spoken with Cromwell first on the phone and then received him as a visitor into his home in the months before his 2014 arrest. *Id.* The Appellant then further admitted that after fleeing the jurisdiction upon learning of the charges in 2012, that he returned to Philadelphia and supported himself by "sell[ing] drugs" and was once again "working as a pimp" and had "somebody working with [him]." *Id* at 206. The Commonwealth diligently sought confirmation asking "Working with you or for you?" to which the Appellant asserted "With me." *Id.* Further, the Appellant admitted that while incarcerated awaiting resolution of these charges, he spoke with victim M.S. on the prison telephone and suggested she seek out Cromwell to help her with problems she was having in renting a room. *Id* at 210. The record supports the conclusion that the Appellant was still operating a prostitution ring with a partner after the charges were filed, had been in contact with Cromwell before his arrest, and suggested M.S. resolve a problem using Cromwell while incarcerated.

There is no evidence to suggest the conspiracy formed between the Appellant and Mr. Cromwell had ever ceased. The scope of the original conspiracy was formed with the intention of

running a prostitution ring in the Philadelphia area. Although a conspiracy ends when its principal objective is achieved, there is no evidence in the record to support the Appellant's conspiracy achieved its principal objective, thereby terminating the conspiracy. Rather, his conduct of continuing a prostitution ring with an unnamed partner suggests the contrary. The Appellant engaged in conduct that went beyond "mere acts of covering up." There was a systematic method engaged by members of the conspiracy to avoid detection and allow the conspiracy to endure. Such acts included telling the girls working for them to tell police they worked by themselves if ever arrested.

In the alternative, the out-of-court statements made by Cromwell were not hearsay. When an extrajudicial statement is offered for a purpose apart from proving the truth of its contents, it is not hearsay and is not excluded under the hearsay rule. *Commonwealth v. Darden*, 457 A.2d 549, 551 (Pa. Super. Ct. 1983). The testimony elicited by the Commonwealth involving an alleged threat by Elton Cromwell was not offered to prove the truth of the matter asserted, but rather as circumstantial evidence of the existence of a conspiracy. "[O]ut-of-court statements of conspirators are often admitted as circumstantial evidence of their participation in a conspiracy." *See Commonwealth v. Cassidy*, 462 A.2d 270, 272 (Pa. Super. 1983) citing David F. Binder, *The Hearsay Handbook* § 5.2 (1982). The testimony concerning the alleged threat by Cromwell is not being made to prove the truth of the matter asserted. The trial court did not abuse its discretion in the admission of such testimony regarding alleged threats made by Cromwell. Additionally, the Appellant did not suffer any prejudice from such admission because: (1) the testimony to prove the existence of a conspiracy was cumulative in nature because other sufficient evidence was admitted to establish such a conspiracy; and (2) all other properly admitted evidence of the conspiracy was so overwhelming that the admission of this testimony regarding the threat by

72

Cromwell could not have contributed to the verdict. Therefore, the trial court did not err in permitting the testimony regarding a threat made by the Appellant's co-conspirator, Cromwell, against a victim.

## VI. Witness Testimony – The trial court properly admitted testimony from Commonwealth witnesses M.S. and A.H.

In his final points of appeal, the Appellant contends that the trial court erred in the admission of testimony from Commonwealth witnesses regarding uncharged conduct without providing defense counsel prior Notice of Intent to Admit Prior Bad Acts pursuant to Pennsylvania Rule of Evidence 404(b). The Appellant makes this similar claim regarding the testimony from two Commonwealth witnesses; although for differing reasons for each witness. In the interest of judicial economy, the trial court will address both claims in one section. For reasons that follow, the Commonwealth was not required to provide notice under Pa.R.E. 404(b).

The standard of review for claims of admissibility is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002). Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. *Id.* The accused is entitled to relief for an erroneous ruling unless the court finds beyond a reasonable doubt that the error is harmless. *See Commonwealth v. Story*, 383 A.2d 155 (Pa. 1978). The "harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. Drummond*, 775 A.2d 849, 853 (Pa. Super. 2001. However,

> It is well established that an error is harmless only if we are convinced beyond a reasonable doubt that there is no reasonable possibility that the error could have contributed to the verdict. The Commonwealth bears the burden of establishing

the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial [e]ffect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Laich*, 777 A.2d 1057, 1062-63 (Pa. 2001). A court sitting as trier of fact is presumed to disregard inadmissible evidence and consider only relevant and competent evidence. *Commonwealth v. Moss*, 852 A.2d 374 (Pa. Super. 2004). The Appellant was not harmed through the admission of the testimony; however, even if such testimony were admitted in error, the admission was harmless error and does not entitle the Appellant to relief.

As an initial matter, the Appellant argues that the testimony from M.S. regarding an anal rape, breaking of ribs and a beating by four persons constituted prior bad acts which required notice under Pennsylvania Rule of Evidence 404(b). N.T. 6//28/2016 at 141-42. The trial court disagrees. Pennsylvania Rule of Evidence 404(b) prohibits admission of evidence of a "crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). Further, Pennsylvania Rule of Evidence 404(b)(4) states that in criminal cases, the prosecution shall "provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Pa.R.E. 404(b)(4). The purpose of this rule "is to prevent unfair surprise, and to give the defendant reasonable time to prepare an objection to, or ready a rebuttal for, such evidence." Pa.R.E. 404(b), cmt. However, there is no requirement that the "notice" must be formally given or be in writing in order for the evidence to be admissible. *See Commonwealth v. Mawhinney*, 915 A.2d 107, 110 (Pa. Super. 2006).

Review of the summary of the statement given by M.S. to the FBI on July 8, 2009 states that M.S. "came back to [the Appellant]. Cromwell, B.O., and Dre held her down while [the Appellant] beat her up. [The Appellant] messed up her face. Cromwell gave B.O. the okay to rape [M.S.]." Def. D-1 at 5. This statement specifically references a beating by four persons and a rape. A defendant has reasonable notice under Rule 404(b) when the Commonwealth has provided the defendant with discovery containing evidence of the prior bad acts. *See Commonwealth v. Stallworth*, 781 A.2d 110, 118, n.2 (Pa. 2001). The discovery containing the evidence of prior bad acts, if such conduct is considered prior bad acts, was furnished to the Appellant. Accordingly, the Appellant would be hard pressed to contend such material was never provided during discovery because the FBI statement being referenced was submitted into evidence by the defense itself. N.T. 6/28/2016 at 140. Any inconsistencies between the submitted FBI statement and the testimony of M.S. should have been borne out and addressed during cross-examination. Therefore, a blanket statement that the Commonwealth failed to provide notice regarding M.S.'s testimony is not persuasive.

The Appellant contends the trial court erred in the admission of testimony from both M.S. and A.H. as to uncharged conduct without prior Notice of Intent to Admit Prior Bad Acts pursuant to Rule of Evidence 404(b) and thereby deprived the Appellant of a fair trial. The trial court does not believe that the testimony of M.S. regarding her anal rape and beatings by the Appellant to qualify as "prior bad acts" within the meaning of Pa.R.E. 404(b)(2). Likewise, the trial court does not believe that the Commonwealth was under a burden to produce such a notice regarding the uncharged conduct of the rape because the conduct was not considered a "prior bad act." When it became apparent to defense counsel that previous statements differed from the

75

testimony presented at trial, regarding both M.S. and A.H, the proper remedy is to address such deficiencies during cross-examination.

Pennsylvania courts have long permitted non-party witnesses, such as M.S. and A.H., to be cross-examined on prior statements they have made when those statements contradict their in-court testimony. These statements, known as prior inconsistent statements, are admissible for impeachment purposes. *Commonwealth v. Brady*, 507 A.2d 66, 68 (Pa. 1986); Pa.R.E. 613(a). Further, a prior inconsistent statement may be offered not only to impeach a witness, but also as substantive evidence if the statement meets additional requirements of reliability. *Commonwealth v. Lively*, 610 A.2d 7, 9-10 (Pa. 1992); Pa.R.E. 803.1. This test it a two-party inquiry: (1) whether the statement is given under reliable circumstances; and (2) whether the declarant is available for cross-examination. *Commonwealth v. Brewington*, 740 A.2d 247, 254 (Pa. Super. 1999). With respect to the first prong, that the statement is given under reliable circumstances, our Supreme Court has deemed reliable only certain statements; a prior judicial proceeding is one such circumstance. With respect to the second prong, the inconsistent statement itself must be the subject of the cross-examination in order to satisfy the test. *Commonwealth v. Romero*, 722 A.2d 1014, 1017 (Pa. 1999).

Regarding the first witness, M.H., the first prong of the test for reliability has been met. M.H. gave a statement to the Federal Bureau of Investigation on July 8, 2009. This statement was reduced to writing and effectively adopted by M.S. The FBI statement that was reduced to writing did, in fact, actually mention a beating by four individuals and a rape. During trial, M.S. testified about an anal rape that occurred, beating by four persons and injuries that she sustained. The defense was provided the opportunity to cross-examine the witness about the inconsistencies and did so during cross-examination. The inconsistent statement itself was the subject of cross-

76

examination when defense counsel asked whether M.S. "testified that [the Appellant] and four other individuals punched you and broke your ribs, right?" and also "then [M.S.] testified that my client forcibly anally raped you, right?" N.T. 6/28/2016 at 102. Therefore, both prongs of the test were met and the Appellant had chance to cross-examine on prior statements.

Regarding the second witness, A.H., the first prong of the test for reliability has been met. A.H. gave sworn testimony at the Appellant's preliminary hearing on October 21, 2014 in Philadelphia Municipal Court. During trial, when defense counsel raised an objection to the statement regarding sexual intercourse with his client stating that "this is the first time that this has been mentioned." N.T. 6/28/2016 at 153. The Commonwealth explained that if defense counsel "thinks that this particular witness didn't testify to this on the other occasions, or he thinks that she didn't relay this during her previous statements, then those [are] questions that he can ask her during cross-examination." *Id.* The trial court agreed with the Commonwealth and overruled the objection. *Id.* However, despite a statement on the record advising defense counsel to raise such questions during cross-examination, the defense failed to raise any questions to A.H. about the sexual intercourse between her and the Appellant. The failure by defense counsel, despite on-the-record direction on how to proceed, to raise such questions should not diminish the reliability of the statement itself. The failure to exercise the right to confrontation and deprivation from the right to confrontation are two entirely distinguishable entities. Therefore, the statement by A.H. should be considered reliable and considered as substantive evidence.

Finally, it is well established that to sustain a conviction the Commonwealth is required to prove each element of a crime by relevant evidence beyond a reasonable doubt. *See Commonwealth v. Walzack*, 360 A.2d 914 (Pa. 1976). Here, the Appellant was charged with two counts of trafficking of persons – one first degree felony for trafficking a minor; the other a

77

second degree felony for trafficking an adult. The previous statute, under which the Appellant is charged, made it an offense for any person to traffic or knowingly attempts to traffic another person, knowing that the other person will be subjected to forced labor or services. 18 Pa.C.S.A. § 3002. Forced labor, in relevant part under this Section, defines forced labor as labor or services that are performed or provided by another person which are obtained or maintained when a person: (1) attempts to cause, causes or by threat of physical menace puts another person in fear of bodily injury; (2) physically restrains or threatens to physically restrain another person unlawfully." 18 Pa.C.S.A. § 3001. The statute, by definition, as one of its elements has a requirement that a person will be subjected to forced labor; which forced labor may come through actual or threatened bodily injury. The trial court believes that such force, for instances of trafficking in persons, is not limited to singular instances which would force debate concerning whether conduct was within the scope of the offense. Rather all acts contemporaneous to the Trafficking of Persons charge should be included under this umbrella and not considered "prior bad acts."

The trial court does not believe the admitted testimony qualifies as prior bad acts that would require such notice under 404(b)(3). Although not binding, this court believes Federal Rule of Evidence 404(b) is instructive because Federal Rule 404(b) "does not extend to evidence of acts which are 'intrinsic' to the charged offense." *United States v. Cross,* 308 F.3d 308, 320 (3d Cir. 2002) (quoting Advisory Committee Notes to Fed. R. Evid. 404(b)). When evidence is intrinsic to proof of the crimes charged, "there is no other wrongful conduct at issue; the evidence is admissible as part and parcel of the charged offense." *Green,* 617 F.3d at 245 (internal quotation marks omitted). Evidence is intrinsic if it directly proves the charged crime, or if it is concerned with contemporaneous acts which facilitated the commission of a charged

offense. *See Green*, 617 F.3d at 248-49. Therefore, under the Federal rules, conduct that is contemporaneous to the charged crime should not be excluded under Rule 404(b).

The trial court heard extensive testimony about the details of human trafficking through Detective Derrick Stigerts, a Commonwealth witness. Detective Stigerts was asked about how prostitutes are controlled by their traffickers, to which he stated that "the most prevalent [method] that we see is the force, the fear, the violence to control the girls, to put some type of fear in them to keep them working, to obey the pimp's rules, to keep doing what she's doing." N.T. 6/28/2016 at 39. Detective Stigerts described how traffickers cultivate, or groom, the victims of trafficking through developing a relationship with the victims in order to affect their control. Simply stated, these acts, be it through violence or other means, to groom the victims of trafficking are not isolated incidents limited in time or scope. These cumulative acts of violence are designed to have the singular effect of controlling the behavior of trafficked girls. Like a constellation in the starry skies, the many stars are brought together to form one singular element. Here, the trial court believes the many separate acts of violence also constitute one singular element: labor or services obtained through actual or threatened bodily injury. Therefore, the trial court correctly held that such actions were not "prior bad acts" that required notice under 404(b)(3).

The Appellant asserts that the trial court erred in permitting the admission of testimony from Commonwealth witnesses M.S. and A.H. The admission of such testimony was not in error because the uncharged conduct went to proving an element of the offense charged. The Appellant was provided the necessary documents to prepare any rebuttal to such testimony at trial. Further, the Appellant had full opportunity to cross-examine the witnesses about perceived inconsistencies from the in-court testimony compared to previous statements. Likewise, if any

79

error had occurred in the admission of such testimony, the Commonwealth more than adequately demonstrate such error was harmless because the Appellant was not prejudiced through such evidence and proved the elements of the charged crimes beyond a reasonable doubt with the other cumulative evidence. Therefore, the trial court did not err in the admission of such testimony and the Appellant is not due relief from its admission.

## CONCLUSION

The evidence presented at trial was sufficient to prove each element of every crime charged by the Commonwealth beyond a reasonable doubt. Although there were numerous charges, the pattern of conduct engaged by the Appellant made simple the task of recognizing the required elements for each offense. Next, having waived his weight of the evidence claims for all but two offenses, the trial court finds that the verdicts were not against the weight of the evidence. The sentencing court did not abuse its discretion in imposing its sentence against Appellant. The factual reasons for departure from the sentencing guidelines were placed on the record and took into account all permissible factors. The trial court properly admitted the testimony of the investigating officer regarding the Appellant's position within the organization because it was rationally based upon his perception. The trial court properly permitted evidence of a threat made by Elton Cromwell, a member of the conspiracy and corrupt organization. Finally, the trial court properly admitted the testimony of two Commonwealth witnesses because the defendant had prior notice of such conduct, had opportunity to cross-examine both witnesses about such inconsistencies and the conduct was not considered "prior bad acts" that would

80

require such prior notice. Accordingly, the Trial Court respectfully requests that the sentence

imposed be affirmed on appeal.

BY THE COURT:

SEAN F. KENNEDY, J.